WILSON–SINCLAIR COMPANY, Appellee,

v.

Leo L. GRIGGS and the Iowa Civil Rights Commission, Appellants.

No. 55918.

Supreme Court of Iowa.

Sept. 19, 1973.

Richard C. Turner, Atty. Gen., Roxanne Barton Conlin, Asst. Atty. Gen., for appellants.

Shuttleworth & Ingersoll, Cedar Rapids, for appellee.

Heard before MOORE, C. J., and MASON, REYNOLDSON, HARRIS and McCORMICK, JJ.

REYNOLDSON, Justice.

This is an appeal by Leo L. Griggs, a black, and the Iowa Civil Rights Commission from a district court decree which nullified a Commission finding that Wilson-Sinclair Company had discriminated against Griggs in his employment. We affirm the district court decision.

Wilson-Sinclair Company (Wilson) operates a meat processing plant in Cedar Rapids, Iowa. Approximately 2600 persons are employed at this plant, of whom 75 to 80 (about 3 percent) are black. Members of the black race in Cedar Rapids total only 1746 persons and constitute 1.58 percent of the city population.

Wilson's employees work in approximately 50 separate departments. Pursuant to the union contract, all vacancies are first filled from within the department according to seniority. Employees ordinarily transfer from one department to another on a seniority basis. An exception is the mechanical department, comprising approximately 80 employees, where the applicants for transfer (or employment) must first achieve a score of 44 on the Bennett Mechanical Comprehension Test. This is a standard test for measuring mechanical aptitude. Most employees in the mechanical department are craftsmen or work with large, complex equipment. At present there are no blacks in this department.

The background leading to the institution of the test is established by uncontroverted and competent evidence. In the ten year period prior to the 1963 adoption of the testing program, people were hired for or transferred to the mechanical department on a trial and error basis. Forty-two such employees were released as incompetent and unsatisfactory for the work. Since 1963 only one man has been released from that department, not on the basis of incompetency but because of his attitude and lack of interest in mechanical work.

Mr. Griggs, a 44 year-old black, has worked for Wilson since 1945. His work record is good. At time of hearing he was working in the beef offal department making $4.04 per hour. Commencing in 1962 he has attempted transfer to the mechanical department ten times. The first attempt in 1962 was before adoption of the testing procedure. Company records initialed by Griggs state the transfer was discussed by him and the master mechanic and both agreed Griggs was not qualified for the available position. The latter claimed on hearing the record was blank at the time he initialed it. Thereafter, his applications for transfer to the mechanical department were denied because he failed to achieve the company's cut-off score of 44 on the mechanical aptitude test. Grigg's scores ranged from 43.5 to only 18 on his last effort.

The record reflects a total of 116 persons have taken the aptitude test since its adoption as a hiring or transfer criterion.

All were white with the exception of Mr. Griggs. Sixty-seven white applicants and Griggs failed to pass. The remaining 48 applicants passed the test and were employed in the mechanical department.

On May 18, 1970 Griggs filed complaint with the Iowa Civil Rights Commission alleging he was discriminated against by the testing procedure.

After hearing, the Commission, on October 7, 1971, issued its findings of fact, conclusions of law, and order. It found Wilson discriminated in employment by use of tests, and ordered that it discontinue use of the Bennett Mechanical Aptitude Test, transfer Griggs to the mechanical department with back pay, "said pay to be based upon the highest grade level seniority would have permitted him to reach had he been properly awarded the job when he first applied." Wilson was ordered to adopt an affirmative action program (designed in cooperation with the Commission) for the recruitment, promotion and upgrading of minority employees. It was ordered to confer with the union relative to methods other than a departmental seniority system for the mechanical department and to submit proposals to the Commission prior to implementation. No tests were to be employed unless "validated and proof of validation submitted" to the Commission before being used. Wilson was directed to report monthly to the Commission the names and address of minority group members applying for employment or transfer and the action taken with respect to each, and to maintain a working relationship with the Cedar Rapids Human Rights Commission, the Commission itself, and with minority groups in the Cedar Rapids area.

Wilson filed petition for judicial review in district court. At time of hearing the court granted Wilson's application to present additional evidence.

On June 13, 1972 the district court entered its findings of fact, conclusions of law, and decree reversing the Commission's order and dismissing the complaint.

Trial court's findings included the following:

"The Bennett test, testified to by complainant's own witnesses, is a leading test to determine mechanical aptitude and is a reliable predictor of mechanical ability. The employees of the mechanical department through normal progression of jobs, and in varying degrees, operate and work with complex machines where mechanical ability is needed to protect the safety of fellow plant employees and the property of the employer. Respondent does not have sufficient employees in the mechanical department to conduct validity tests on the usefulness of the Bennett test, but complainant has not shown the test to be an invalid predictor. Complainant has further not shown the test was given by respondent to prevent blacks from transferring to the mechanical department or that because of Leo Griggs' race, the test prevents his transfer to said department."

Summarized, the issues raised by the Commission and Griggs are: (1) Should district court have allowed Wilson to introduce additional evidence without showing good cause for failure to present that evidence at the Commission hearing? (2) Should district court have concluded, on the basis of the record before it, that Wilson's use of the Bennett Mechanical Comprehension Test did not discriminate against Griggs and the class he represents? (3) Should district court have required Wilson to submit empirical proof of business necessity for continuing use of the Bennett Test? (4) Was district court right in setting aside and dismissing Commission's total order, even assuming Griggs' claim was unfounded?

■ I. Before going to the merits of the controversy, we are compelled to comment on a procedural matter. We approved counsel's stipulation to follow the revised rules of appellate procedure effective January 1, 1973. Papers filed missed the mark by a wide margin. Attached to appellants' brief are pages entitled "Appendix." These set forth relevant pleadings, the Commission's Order, and the findings, conclusions, judgment and decree in district court, but nothing relating to the evidence. A single entry purports to incorporate the full transcripts of the proceedings before the Commission and before the district court, totaling 367 pages, as "exhibits." Two copies of these transcripts ultimately were submitted to us.

This procedure violates both the letter and the purpose of the rules. Rule 344.-1(a), Rules of Civil Procedure provides in part:

"The appellant shall prepare and file an appendix to the briefs *which shall contain*: * * * any *relevant* portions of the * * * transcript * * *." (Emphasis added.)

Appellee's counsel fell into lockstep with counsel for appellants and appellee's brief is keyed to the voluminous transcripts. No one could conscientiously contend even half of the 367-page transcript was relevant to this appeal.

The rule change was made on the theory it would save litigation time and expense formerly consumed in laboriously abstracting the transcript and in hearings to settle the record. Recognizing the proliferation of federal litigation, we adopted the federal format, anticipating the Iowa lawyer could then move with ease from state to federal appeals and back again.

■ It was intended only those portions of the transcript unquestionably relevant to the litigants' contentions would appear verbatim in the appendix. The following provision in rule 344.1(b), R.C.P. was inserted to persuade counsel to minimize the volume of materials to which this court must refer:

"In designating parts of the record for inclusion in the appendix, the parties shall have regard for the fact that the entire record [which includes the transcript] is always available to the court for reference and examination *and shall not engage in unnecessary designation*."

Unnecessary designation will of course result in taxing of costs to that litigant. Rule 344.1(b), R.C.P. See generally Blackburn, "The Appellate Rules Amendments—Suggested Forms and Timetables," 22 Drake L.Rev. 223, 242–45 (1973). Only where we grant prior approval may a case be submitted on the original record alone. Rule 344.1(f), R.C.P.

■ It is true rule 344.1(e), R.C.P. provides the transcript of a proceeding before an administrative agency may be included in the appendix or bound with other exhibits in a separate volume, or volumes, suitably indexed. In that event, eighteen copies are to be filed with the appendix and two copies served on opposing counsel. No attempt was made to comport with this rule. In any event, unnecessary parts of an exhibit transcript should be eliminated through careful designation by counsel of those portions to be included in the appendix or separate volume.

The procedure here employed also violates rule 344.2, R.C.P. The transcript submitted is not in such form as to permit eventual uniform permanent binding.

This court upon its own motion may dismiss an appeal for failure to comply with our rules. Rule 345, R.C.P. We have approached these situations arising in the first months under the revised rules with a tolerance for attorney failures to read and follow them. Understandably, if appellate process is to be streamlined, we must soon adopt a more inflexible position. Attor-

neys will save their valuable time by following these rules. We cannot permit additional economy at the expense of increasing the burdens of this court.

II. Wilson argues it had an unlimited statutory right to introduce additional evidence upon appeal to district court, under language found in § 105A.10(6), The Code, 1971:

"6. The hearing on appeal shall be tried in equity and shall be de novo. The court may receive additional testimony and may affirm, modify, or reverse the order of the commission."

The Commission and Griggs forcefully assert there is no such right without a showing of good cause for failure to adduce that evidence before the Civil Rights Commission.

Wilson's position, they argue, ignores the statutory scheme of the total enactment. Pertinent provisions of the Civil Rights chapter 105A, The Code, 1971, refer to "judicial review" of Commission action (§ 105A.10) upon a transcript (§ 105A.-10(3) ). Section 105A.10(4) prohibits the court from considering an objection not urged before the Commission unless failure to urge the objection shall be excused because of extraordinary circumstances. Section 105A.10(5) permits a limited remand from district court back to the Commission, in the interests of justice, for the purpose of presenting additional evidence and seeking findings thereon, "providing such [moving] party shall show reasonable grounds for the failure to adduce such evidence before the commission." Section 105A.10(11) admonishes, "Petitions [for judicial review] filed under this section shall be heard expeditiously and determined upon the transcript filed without requirement for printing."

Adoption of Wilson's contentions, argue the Commission and Griggs, would result in deliberate withholding of evidence at the Commission level, for later submission to the court. Commission hearings would be used only for discovery, and the expertise, flexibility and imaginative solutions of the Commission would be lost with respect to the serious problems presented by these proceedings. All issues would be re-litigated in district court.

We do not disregard the merit in those expressed fears. On the other hand, those limitations we are urged to read into § 105A.10(6) were not inserted there by the legislature, which has demonstrated in other instances it can be specific and detailed with respect to restrictions on post-appeal presentation of evidence. See § 490A.16 and § 507B.8(2), The Code.

In Iron Workers Local No. 67 v. Hart, 191 N.W.2d 758 (Iowa 1971) we shielded this legislation from assault on constitutional grounds. We said while the power delegated to the agency was not accompanied by precise standards, the procedure established for the exercise of power furnished adequate safeguards for those affected by the administrative action. See Elk Run Telephone Co. v. General Telephone Co., 160 N.W.2d 311 (Iowa 1968); Note, Safeguards, Standards, and Necessity: Permissible Parameters for Legislative Delegations in Iowa, 58 Iowa L.Rev. 974 (1973). One of those safeguards mentioned in *Iron Workers* was the opportunity to present additional evidence in district court.

Where there is no statutory direction forbidding additional evidence to be adduced in district court appeals from administrative adjudications, this court has followed the general rule that a direction for de novo review alone permits production of additional evidence. Buda v. Fulton, 261 Iowa 981, 157 N.W.2d 336 (1968); Mason v. World War II Service Compensation Board, 243 Iowa 341, 51 N.W.2d 432 (1952); 2 Am.Jur.2d, Administrative Law § 698, pp. 597–99; 73 C.J.S. Public Administrative Bodies and Procedure §§ 203, 204, pp. 552–556. We cannot follow the rationale that an express grant of right to take additional evidence should in some way

limit the rule which permits such procedure absent such provisions where, as here, the hearing is to be tried in equity and de novo.

The Commission and Griggs claim only limited support from our decisions restricting the supplemental evidence and the scope of the de novo review provided in § 358A.21 and in § 414.18, The Code, involving reviews of board of adjustment decisions. See Buchholz v. Board of Adjustment of Bremer County, 199 N.W.2d 73 (Iowa 1972); Vogelaar v. Polk County Zoning Bd. of Adjustment, 188 N.W.2d 860 (Iowa 1971); Deardorf v. Board of Adjustment of Plan. & Zon. Com'n, 254 Iowa 380, 118 N.W.2d 78 (1962). Those exceptions to the general rule are grounded on a unique statutory scheme in each chapter which brings the case to the district court on writ of certiorari, but provides de novo review. That situation does not exist here, and the general rule applies. For an overview of the complex, incomplete and inconsistent judicial review provisions which abound in The Code, see Bezanson, Judicial Review of Administrative Action in Iowa, 21 Drake L.Rev. 1 (1971).

At the same time we must observe it would save district court time, and secure the benefit of the Commission's findings, for district court upon proper showing to remand the case to the Commission pursuant to § 105A.10(5). Further, the transcript of the Commission proceedings is required to be filed in the district court and is part of its records. Ordinarily it will be before that court when motion to submit additional evidence is made. We have no hesitancy in observing that if it then appears movant had failed to make a good-faith effort to litigate the case before the Commission, the district court should, in light of the overall statutory scheme and application of rule requiring exhaustion of administrative remedy, overrule the motion. See Dehning v. Eads, 201 N.W.2d 454 (Iowa 1972) and cases there cited on exhaustion doctrine. In this instance the Commission hearing transcript plainly reflects Wilson's good-faith effort to litigate the controversy before that body.

■ We hold district court rightly permitted Wilson to submit the limited additional evidence disclosed by this record.

III. The most troublesome issue is whether the district court correctly concluded Wilson's use of the Bennett Mechanical Comprehension Test did not discriminate against Griggs.

Griggs' complaint charged:

"I believe that I have been discriminated against by testing which psychologically screens out minorities and also employees past a certain age. No testing was required when I first applied for transfer (1962) but I was not given the job in question. Since that time I have been required to take a test and am always told that my score is never high enough. I think a psychological test should take into consideration all cultural backgrounds and the questions should be job-related."

The issue of age was stipulated out of the case during the Commission hearing. It is undisputed the burden of proving the allegations of his complaint was on Griggs. Section 105A.9(11), The Code, 1971.

This is the first time we have been confronted directly with the issue of written tests as an alleged device for discrimination in employment. We find no helpful state decisions. However, there are numerous relevant federal decisions growing out of the provisions of the federal legislation, Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), creating the Equal Employment Opportunity Commission. In *Iron Workers* we noted the similarity of language in that legislation and our own Civil Rights Act.

On this issue much of the uncertainty in the federal decisions was resolved by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The unanimous court, per

Burger, C. J., there held, 401 U.S. at 430–432, 91 S.Ct. at 853–854, 28 L.Ed.2d at 164–165:

"Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrmination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment *when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.*

" * * * The Act proscribes not only overt discrimination, but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice *which operates to exclude Negroes* cannot be shown to be related to job performance, the practice is prohibited.

" * * * We do not suggest that either the District Court or the Court of Appeals erred in examining the employer's intent; but good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms *that operate as 'built-in headwinds' for minority groups* and are unrelated to measuring job capacity." (Emphasis added.)

Federal decisions following *Duke Power* have consistently held where there is proof a testing device discriminates against blacks, the burden shifts to the employer to prove the test has been "validated" for job relatedness. If the test cannot be shown to be related to job performance, the practice is prohibited, even though the employer's subjective intent to discriminate is not established. See United States v. Georgia Power Company, 474 F.2d 906 (5

Cir. 1973); United States v. Jacksonville Terminal Company, 451 F.2d 418 (5 Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal.1972); Fowler v. Schwarzwalder, 348 F.Supp. 844, 351 F.Supp. 721 (D.Minn.1972); Baker v. Columbus Municipal Separate School District, 462 F.2d 1112 (5 Cir. 1972).

■ We adopt the persuasive rationale of *Duke Power.* Our legislation prohibits unfair employment practices without reference to motive, although motive is always a legitimate field of inquiry. A conscious course of practice which results in a "built-in headwind" against minorities is surely as illegal as a practice motivated by a clear discriminatory intent. A further reason for adopting an objective criterion is pertinently stated in Holland v. Edwards, 307 N.Y. 38, 45, 119 N.E.2d 581, 584, 44 A.L.R.2d 1130 (1954), "One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose."

In adopting the *Duke Power* rule, we reserve the question whether the stringent guidelines for test validation laid down by the Equal Opportunity Employment Commission and generally followed by the federal courts are either necessary or desirable under the Iowa Civil Rights Act. See Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 (1972); United States v. Georgia Power Company, supra; Western Addition Community Organization v. Alioto, supra. The federal guidelines have been promulgated as rules by the Iowa Civil Rights Commission. 1973 I.D.R. 94–97. The Commission does not rely on these rules for support in this case. This avoids a confrontation with the legal issues raised by the attorney general's disapproving advisory opinion when the proposed rules were submitted to him as required by chapter 17A, The Code.

Problems in meeting the complex federal validation requirements are discussed in Western Addition Community Organiza-

tion v. Alioto, supra, 340 F.Supp. at 1354–1355. See also Wilson, A Second Look at Griggs v. Duke Power Company: Ruminations on Job Testing, Discrimination and the Rule of the Federal Courts, 82 Va.L. Rev. 844 (1972). Our extensive research of federal decisions has failed to disclose a single example of a written test passing muster under the guidelines for validation. A study of these cases discloses why one who was instrumental in adoption of the guidelines has observed Title VII may become a full-employment act for industrial psychologists. Blumrosen, Strangers in Paradise: Griggs v. Duke Power Co. and the Concept of Employment Discrimination, 71 Mich.L.Rev. 59, 104 (1972).

Our decision in this case need not reach beyond the threshold question whether this record demonstrates the Bennett Test as used by Wilson as a mechanical department transfer requirement actually discriminated against Griggs or his class. Unless the Commission and Griggs carried that burden of proof, the issue of validation is not before us.

At the outset the Commission and Griggs admit that because the latter was the only black to whom the test was administered, it is impossible to show a statistical disparity between black and white applicants for transfer to the mechanical department. They further concede (and Commission's findings so state) there is no evidence to show Wilson intended to discriminate by use of tests.

The Commission and Griggs, arguing nonetheless the test discriminates, rely entirely on findings in federal decisions respecting such tests, grounded on different records, certain books and articles which have not been offered in evidence, and the opinion of a psychologist supported by no relevant facts.

Turning to the federal decisions, the court-framed question in *Duke Power* was restricted to a general intelligence test (Wonderlic Personnel Test) and not to the Bennett Mechanical Comprehension Test. Important to that decision was the finding the petitioners had "long received inferior education in segregated schools." The supreme court also footnoted 1960 census statistics disclosing in North Carolina 34 percent of white males and only 12 percent of negro males had completed high schools. Griggs v. Duke Power Co., 401 U.S. at 430, 91 S.Ct. at 853, 28 L.Ed.2d at 163, n. 6. In the case *sub judice,* the record shows Griggs attended an integrated school in which blacks comprised only 25 to 35 percent of the pupils. He has a high school diploma and commendably has obtained college credits. Griggs resides in a good neighborhood inhabited largely by whites. There is no competent evidence before the court to show blacks in the Cedar Rapids area received an inferior education or suffer cultural deprivation which would affect their Bennett Test scores. According to the 1970 census, the average education level for blacks in Cedar Rapids is 11.4 years completed. The average education level for whites is only slightly higher at 12.4 years completed.

Nor do we believe the Iowa legislature in establishing a district court de novo review in equity in these cases intended to create evidentiary presumptions not applicable generally to trials in equity or intended to permit factual issues to be established by materials referred to in party's briefs but not offered in evidence. An exception long recognized by this court is judicial notice of impartial census statistics. Iron Workers Local No. 67 v. Hart, supra; In re Primary Road No. Iowa 141, 255 Iowa 711, 124 N.W.2d 141 (1963).

The Commission and Griggs rely on the testimony of Dr. Richard S. Barrett, an industrial and educational psychologist with extensive experience in testifying for claimants in civil rights cases. His sole prior experience in Iowa was a brief stop in Dubuque while on a boat trip up the Mississippi. He was not familiar with the packing industry, had no knowledge of educational facilities in Iowa, nor any acquaintance with the educational level of workers in Iowa packing plants. His testi-

mony was that the Bennett Test "most probably" would discriminate against blacks because generally blacks do not do as well as whites on paper and pencil tests. He admitted the test would determine the group having the highest mechanical aptitude, but questioned whether mechanical aptitude was a predictor of job success.

Dr. Barrett advanced no empirical studies or experiences involving this standard test to substantiate his opinion as it related to the case before us.

■■■ The acceptance or rejection of opinion evidence does not depend upon the expert's abstract qualifications alone. Bernal v. Bernhardt, 180 N.W.2d 437 (Iowa 1970). Such an opinion must necessarily be tested by the specific facts upon which it is based, stated by the witness or presented in a hypothetical question. Albrecht v. Rausch, 193 N.W.2d 492 (Iowa 1972). We have said an expert's opinion rises no higher than the level of evidence and logic on which it is predicated. In re Springer's Estate, 252 Iowa 1220, 110 N.W.2d 380 (1961). Even if uncontroverted, expert opinion testimony is not binding on the trier of fact; it may be accepted in whole, in part, or not at all. Olson v. Katz, 201 N.W.2d 478 (Iowa 1972).

It has been elsewhere observed that opinions of expert industrial psychologists are not sufficiently objective to permit the trier of fact to make an independent decision concerning the impact of a particular testing device. Note, Application of EEOC Guidelines to Employment Test Validation: A Uniform Standard for Both Public and Private Employers, 41 Geo. Wash.L.Rev. 505, 519 (1973). We need not adopt such broad assertion in order to reject, as we do, the opinion of Dr. Barrett in this case. His overall testimony was directed to the issue of Wilson's alleged illogical criteria for employment and transfer into the mechanical department. Whether or not Wilson's methods are wise or unwise is an issue not before us. Neither the Commission nor the court should substitute its judgment for that of the employer in establishing policies for hiring and transfer in the absence of any showing of discrimination by reason of race or color. New York Telephone Company v. Wethers, 36 A.D.2d 541, 317 N.Y.S.2d 119 (1971).

■■■ We hold the Commission and Griggs have not carried their burden to prove Wilson's use of the Bennett Test discriminated against blacks. Under the *Duke Power* rule the issue of test validation is not reached. At the same time, in holding district court reached the right result, we must caution that its finding quoted above should not be construed to impose on a complainant the burden to prove a written test is an invalid predictor of job success, or to prove in every instance the employer's specific intent to discriminate.

III. What we have already said virtually disposes of the third issue raised by the Commission and Griggs, who claim that nonetheless Wilson should not be permitted to continue using the Bennett Test without being required to present empirical proof of its business necessity.

The brief and argument filed by the Commission and Griggs asserts they have searched the authorities and have found no case which allows use of paper and pencil tests without the production of proof of validation. Our search has disclosed no case where such proof has been required where the court had not first found either statistical evidence the test as used discriminated, or a subjective intent on the part of the employer to discriminate.

It is uncontroverted in the evidence the vocabulary level of the test is not in excess of that of the average person in the fifth or sixth grade. Mr. Griggs testified he had no trouble with the reading part of the examination.

The following are questions on one page of the Bennett Mechanical Comprehension Test:

5

Which stepladder is safer to climb on?

6

Which spot on the wheel travels faster?

7

Which staircase would take less room?

8

Which man can lift more weight?

[A7957]

On a separate answer sheet the person being examined makes a simple mark under "A", "B", or "Equal", indicating his answer. There is nothing about the test itself from which this court could judicially note it discriminates on the basis of race or color and must therefore be "validated" for job relatedness. The Commission and Griggs concede in their reply brief the experts for each party agreed the test measured mechanical comprehension.

We hold to our conclusion that in the absence of competent evidence of a discriminatory intent or result, Wilson is free to select its own employment practices.

IV. Finally, the Commission asserts the district court should not have dismissed its total order, even assuming Griggs' claim was unfounded.

In *Iron Workers* we said, 191 N.W.2d at 767:

"Section 105A.9(12) [The Code] gives the Commission, if it finds respondent engaging in an unfair or discriminatory practice, tools to eliminate such practice. One tool is prohibitive action—Commission may order respondent to cease and desist. The other tool is to direct 'affirmative action' to correct the condition —reinstatement, reemployment, and such other measures."

We there refused to modify a Commission order requiring respondent to validate all tests for cultural bias and job relatedness. This was not because it was established the seven aptitude tests used by the labor union in fact discriminated. The remedial order was approved by this court to strip one already found guilty of other overt discriminatory acts of all devices which might be employed in further discrimination.

But the Commission refers to that part of its order requiring Wilson to adopt an affirmative action program "for the recruitment, promotion, and upgrading of minority employees." It contends such provisions should be enforced, relying on a few lines of testimony indicating Wilson has no black foremen or management personnel. The Commission also claims support from a pre-hearing questionnaire submitted to and completed by Wilson. This document when offered at hearing was objected to by Wilson as immaterial. The completed questionnaire shows no blacks in management positions. It also indicates no blacks in the lowest category (service workers), only three in the category of unskilled laborers, and almost all of the remaining black employees in the categories of semiskilled operatives and skilled craftsmen.

In view of the small number of blacks employed (although exceeding the ratio of black to white population in the community) we do not deem this statistically significant, assuming we were to consider the questionnaire.

This record does not disclose a single instance of a black, qualified or unqualified, being denied employment or promotion to a supervisory position. Relief on this issue is not appropriate. See Quarles v. Philip Morris, Incorporated, 279 F.Supp. 505, 508 (E.D.Va.1968).

Nor is there any evidence to show Wilson has not taken reasonable and appropriate steps to recruit blacks. While this issue was not within the ambit of the complaint filed, we nevertheless observe criticism can hardly be leveled at Wilson's recruitment program when the percentage of blacks in its work force is almost twice the percentage of blacks in the general population of the community.

Furthermore, there was no competent evidence Wilson discriminated against

blacks, including Griggs, by failing to "up-grade" them. Griggs testified he wanted to transfer to the mechanical department because he would like an hourly work week and an increase in pay. The record discloses in so doing he would earn considerably less than his present pay level of more than $1000 per month because there would be no opportunity for overtime. He would likely encounter a rotating shift and night work. The basic hourly pay increase would be ten cents. But under the uncontroverted evidence his seniority would entitle him, and he could move, to higher paying positions in his own department and in other departments to which he could transfer without passing the Bennett Test. This situation does not disclose a picture of discriminatorily failing to upgrade an employee.

 Lastly, we note the Commission did not find any discrimination with respect to recruitment, promotion or upgrading of black employees. Its finding was confined to the sole complaint charged and litigated, that Wilson discriminated in hiring and transfer through the use of tests. This finding was not supported by the required quantum of evidence, and the district court properly so held. A mere suspicion in alleged discrimination cases is not enough. See Motorola, Inc. v. Illinois Fair Employ. Prac. Com'n, 34 Ill.2d 266, 215 N.E.2d 286 (1966). Under the plain language of § 105A.9(12), The Code, 1971, the Commission's power and authority to issue any order is contingent upon a finding of a discriminatory practice. None is shown by this record.

Other arguments advanced by the Commission and Griggs have been considered and found without merit.

The decree of the district court is affirmed.

Affirmed.