# IN THE COURT OF APPEALS OF IOWA

No. 19-1511
Filed June 3, 2020

**CLIFFORD J. WATKINS, III,**
Plaintiff-Appellant,

**vs.**

**CITY OF DES MOINES, PAT KOZITZA, JOHN DESIO, and TONY CHIODO,**
Defendants-Appellees.
_____

Appeal from the Iowa District Court for Polk County, Samantha Gronewald, Judge.

A public works employee appeals the grant of summary judgment to the city and its administrators on his claims of racial discrimination and hostile work environment. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.

Matthew R. Denning of Spaulding & Shaull, PLC, Des Moines, for appellant.

John O. Haraldson, Assistant City Attorney, for appellee.

Considered by Tabor, P.J., and Mullins and Schumacher, JJ.

**TABOR, Presiding Judge.**

Clifford Watkins sued the City of Des Moines and three of its administrators.[1] He raised claims of racial discrimination in promotions and hostile work environment. The district court granted the city's motion for summary judgment. Watkins asks us to reverse the summary judgment and remand for trial. Because Watkins offered evidence that two of three members of the interview panel made statements arguably showing racial animus, he generated a jury question on the city's motivation in turning him down for a promotion. We reverse the summary judgment on that claim. Because Watkins did not create a genuine issue of material fact that "discriminatory intimidation, ridicule and insult" permeated his workplace, the city was entitled to judgment as a matter of law on the hostile work environment claim. We thus affirm in part, reverse in part, and remand for further proceedings.

## I. Facts and Prior Proceedings

Watkins, who is African American, started working for the city of Des Moines in 1992. In 2005, the city promoted him from light equipment operator to medium equipment operator. At the time of his lawsuit, he continued to work in the street maintenance division of the city's public works department.

## A. The Promotion Process

In spring 2014, Watkins sought another promotion. He applied to be a public works section chief. The civil service process required interested

---

[1] Pat Kozitza was director of the Des Moines public works department in 2014 but is now retired. John Desio was a public works section chief; he retired in 2014. Anthony Chiodo was and remains a public works section chief.

candidates, including Watkins, to take a written test.  Watkins scored twenty-nine out of fifty possible points on that test.  Although his score was among the lowest of the applicants, the city considered him qualified for the promotion because of his education and experience.  In that category, Watkins scored near the top of the eligible applicants.

Watkins was one of eight candidates who interviewed for the position.  The interview panel included Adam Smith, Sara Thies, and Tony Chiodo.  Smith was an operations manager.  Chiodo was Watkins's direct supervisor.  Thies oversaw the street maintenance division of the city's public works department.  She was in charge of the promotion process and forwarding a recommendation to the public works director.

The three-member panel scored the applicants on their answers to twenty questions developed by Thies.  The panelists reached a "consensus" score of zero to five points on the applicants' responses to each question.  Watkins received a score of forty-two on his responses to the interview questions.  Ryan Rivas received a score of seventy-two, the highest among the applicants.  After the interviews, Thies recommended Rivas to fill the section chief position.

In the wake of being turned down for the promotion, Watkins recounted two incidents that involved members of the interview panel.

**B.     The "Monkey" Comment**

Watkins testified in his deposition that Chiodo called him a "monkey" during a February 2014 phone call.  Here is the context.  According to Watkins, when he was acting as a temporary section chief, Sara Thies asked him to notify Chiodo that a local television station wanted to record city workers filling potholes, a

perennial end-of-winter phenomenon. The request required moving a city crew to another location. Watkins was reluctant to make the call because Chiodo was his boss. His reluctance was warranted. Watkins remembers Chiodo saying during the call: "What are you like, a monkey?"

Chiodo recalled the conversation differently. He acknowledged saying "monkey," but said it was in the context of moving the work crew across town. According to Chiodo, he told Watkins: "You can't be running them all over, jumping around like monkeys." Arguing the word was innocuous, Chiodo claimed to call his granddaughters "monkeys" when teasing them. Chiodo believed Watkins "misinterpreted" the call.

Watkins casts doubt on Chiodo's version by recounting a second incident that same day. According to Watkins, section chief Desio followed up on Chiodo's "monkey" comment by throwing a banana peel on the floor near Watkins's desk. Watkins recalled Chiodo laughing. But in his deposition, Chiodo denied seeing it happen and said he told Watkins he needed to talk directly to Desio about it.

### C. The "Stepin Fetchit" Comment

Chiodo was not the only interviewer who made a racially charged comment. Three years after the interviews, Thies received an oral reprimand for using a discriminatory phrase. Bobby Palimore, an African-American employee, complained in 2017 that he overheard Thies refer to a member of a city street crew as "dumb" before saying, "I know this may be derogatory, but I call that Step and Fetch It Syndrome."

In her deposition, Thies admitted using the phrase "step and fetch it" in reference to an ineffective employee. She claimed she was talking about a white

"senior maintenance carpenter" who was called to "fetch" tools for work crews. Thies insisted she did not know the phrase was considered derogatory. She testified she "looked it up on Wikipedia" and then realized "that phrase could be misinterpreted." As Thies learned in her on-line research, African-American actor Lincoln Theodore Perry adopted the name "Stepin Fetchit" in the 1930s for his caricatured portrayal of black people.[2] Thies acknowledged Palimore was "visibly and audibly upset" after overhearing her comment. Thies testified she "felt bad what [she] said was taken as an insult."

### D. Other Incidents in the Public Works Department

As part of his hostile work environment claim, Watkins reached back to 2006 when he complained that a rag doll had been hung by its neck in a city supply shed. After an investigation, the city's equal opportunity administrator found: "The rag doll, whether intended to be a leprechaun, a voodoo doll, or a racially-based statement about hanging a slave, is totally inappropriate in the workplace." The administrator recommended diversity awareness training.

In the same year as the doll-lynching incident, a coworker asked Watkins how he could operate a concrete truck by himself. Before Watkins could reply, he remembers then-public works director Kozitza, who is Caucasian, saying: "If he doesn't run it, we're going to hang him."

---

[2] In 1968, CBS broadcast a series entitled "Black History: Lost, Stolen, or Strayed," in which actor Bill Cosby delivered the following narration: "The tradition of the lazy, stupid, crap-shooting, chicken-stealing idiot was popularized by an actor named Lincoln Theodore Monroe Andrew Perry. The cat made two million dollars in five years in the middle thirties. And everyone who ever saw a movie laughed at—Stepin Fetchit." Perry unsuccessfully sued the company for defamation. *Perry v. Columbia Broad. Sys. Inc.*, 499 F.2d 797, 799 (7th Cir. 1974).

In 2007, Watkins recalls a coworker using a racial slur at a work function. The coworker called a cigarette butt a "n----- lipper." Watkins reported the statement to a supervisor who was at the party.

Two years later, Watkins asked for a step to make his truck more accessible. He recalls being turned down, though the city approved a similar request from a white worker. Watkins also asserted the city consistently rejected his requests to attend out-of-town trainings and an African-American colleague faced the same rejections. Watkins supplied another example of unequal treatment that allegedly occurred in 2013 when he was taking prescribed medication following back surgery. He contends Thies required him to twice undergo drug testing, when no other public works employee had to do so when on light duty.

In late 2013, the public works department posted a notice for "temporary upgrades" for employees interested in a section chief position. Watkins was eligible for that set up but asserts he was not provided the same on-the-job training as the other candidates. When Desio retired in April 2014, the city recruited candidates to fill the section chief position on a permanent basis.

## E. Underrepresentation of African-American Supervisors

On top of these specific incidents, Watkins provided history showing the underrepresentation of African-American employees in the administrative ranks of the city's public works department. Watkins offered deposition testimony from deputy public works director Bruce Braun. Braun could not recall any African-American section chiefs in the street maintenance division during his three-decade tenure. Only four African-American employees had served as section chief for any

division in the public works department, according to Braun. And the city promoted no African-American employees to the positions of street maintenance administer, assistant public works director, or public works director during Braun's tenure.

### F.     The Lawsuit

In March 2018, Watkins sued, alleging the city violated the Iowa Civil Rights Act (ICRA) by failing to promote him and by subjecting him to a hostile work environment.[3] About one year later, after the parties engaged in discovery, the city moved for summary judgment. Watkins resisted. To support their positions, both sides submitted appendices containing affidavits, depositions, and other relevant documents. In June 2019, the district court granted the city's motion for summary judgment. Watkins filed a motion to reconsider, enlarge, or amend under Iowa Rule of Civil Procedure 1.904(2). The district court amended an error in its original order on Watkins's qualifications for the promotion but confirmed the grant of summary judgment. Watkins now appeals.

### II.     Scope and Standard of Review

We review the grant of a motion for summary judgment for correction of legal error. *Otterberg v. Farm Bureau Mut. Ins. Co.*, 696 N.W.2d 24, 27 (Iowa 2005). The district court should grant a summary-judgment motion only if, viewing the evidence in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

---

[3] Watkins also included a claim for disability discrimination. He asserted a disability based on his right leg being amputated below the knee. But Watkins did not resist the city's motion for summary judgment on his claim of disability discrimination. So that claim is not part of this appeal.

that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). In deciding whether there is a genuine issue of material fact, the district court must afford the nonmoving party, here Watkins, every legitimate inference the record will bear. *See Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005).

When viewing a summary-judgment record, our role is to act as judges, not jurors. *See Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 841 (Iowa 2005) ("[A] court deciding a motion for summary judgment must not weigh the evidence, but rather simply inquire whether a reasonable jury faced with the evidence presented could return a verdict for the nonmoving party."). We cannot usurp the jury function by making inferences adverse to Watkins, the nonmoving party. "Mere skepticism of a plaintiff's claim is not a sufficient reason to prevent a jury from hearing the merits of a case." *Id.*

### III. Analysis

### A. Racial Discrimination in Promotion Decision

Watkins contends the city discriminated on the basis of race when it passed him over for a promotion in 2014.[4] He brings his claim under the ICRA. *See* Iowa Code § 216.6 (2014) (defining unfair employment practices). We construe that act "broadly to effectuate its purposes." Iowa Code § 216.18(1). We look to federal statutes for guidance in evaluating our state law. *See Hedlund v. State*, 930 N.W.2d 707, 719 (Iowa 2019) (noting ICRA is modeled after Title VII of the U.S.

---

[4] Although Watkins relies in part on *Wilson-Sinclair Co. v. Griggs*, 211 N.W.2d 133, 140 (Iowa 1973), a disparate impact case, he is claiming disparate treatment. *See generally Pippen v. State*, 854 N.W.2d 1, 9 (Iowa 2014) (explaining civil rights laws targeting employment discrimination protect against both disparate treatment and disparate impact).

Civil Rights Act). But we also recognize differences under the ICRA. *See Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 269 (Iowa 2019).

Against that backdrop, both parties and the district court analyzed the question under the *McDonnell Douglas* burden-shifting framework used in Title VII employment discrimination cases.[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Our supreme court has directed Iowa trial courts to apply the "motivating factor" standard rather than the *McDonnell Douglas* analysis *when instructing juries* in ICRA discrimination cases. *See Hawkins*, 929 N.W.2d at 272. But whether *McDonnell Douglas* still governs *summary-judgment motions* on mixed-motive claims remains an open question. *Hedlund*, 930 N.W.2d at 720 (Iowa 2019) (analyzing summary judgment under both standards).

## 1.  *McDonnell Douglas*

Under the *McDonnell-Douglas* rubric, Watkins had the burden to make out a prima facie case in support of his claim by producing evidence showing (1) he belonged to a protected class; (2) he was qualified for the section chief position; (3) the city rejected him for the position; and (4) the city promoted someone outside the protected class.[6] *See Cox v. First Nat'l Bank*, 792 F.3d 936, 938–39 (8th Cir.

---

[5] Despite the racially derogatory statements credited to Thies and Chiodo, Watkins does not contend he has "direct evidence" of discrimination that would allow him to bypass the three-part *McDonnell Douglas* test. *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (clarifying that in this context "direct evidence" is not the converse of "circumstantial evidence" but rather means proof of "a specific link between the alleged discriminatory animus and the challenged decision" sufficient for a reasonable fact finder to believe illegitimate criteria motivated the adverse employment action).

[6] The city notes the successful candidate, Rivas, is Hispanic. But the city does not argue that by promoting a member of a different minority group, it has rebutted this fourth element of Watkins's claim.

2015); *see also Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014) (describing fourth element as hiring someone not in the protected class with "similar or lesser qualifications").  The record shows Watkins satisfied these four elements.

So then, under *McDonnell Douglas*, the burden shifts to the city "to articulate a legitimate, nondiscriminatory reason" for not promoting Watkins.  *Hedlund*, 930 N.W.2d at 720 (quoting *McDonnell Douglas*, 411 U.S. at 802).  As its nondiscriminatory reason, the city asserted Rivas was more qualified for the promotion because he scored higher than Watkins on the civil service written exam and was the highest scorer in the consensus of the three-member interview panel.  As the city rightly points out, an employer may compare the performance of the applicants during their interviews.  *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1049 (8th Cir. 2011).

After the city articulates its nondiscriminatory reason, the burden shifts back to Watkins to submit evidence that the city's stated reason is a pretext for its discriminatory intent.  To meet that burden, Watkins targets the subjectivity of the panel's interviews.  We closely scrutinize "subjective promotion procedures" because of their susceptibility to discriminatory abuse.  *See Hedlund*, 930 N.W.2d at 723.  Watkins contends the panel's questions were "entirely subjective" and the grading of the candidates' responses "relied solely upon the panel's own note taking for each response."  He believes the "subjective grading" of the interview performances posed "obvious risks" to the impartial scoring of the candidates.  To highlight those risks, he points to deposition testimony by panelists Smith and Thies acknowledging discrepancies in the scoring system.

In response, the city argues "where the employer does not rely exclusively on subjective criteria, but also on objective criteria, the use of subjective considerations does not give rise to an inference of discrimination." *See Wingate v. Gage Cmty. Sch. Dist., No. 34,* 528 F.3d 1074, 1080 (8th Cir. 2008). For proof of objective criteria, the city points to its use of the written civil service test to screen eligible candidates.

Granted, Rivas scored considerably higher than Watkins on the written civil service test. (Out of a possible fifty points, Watkins received twenty-nine while Rivas received forty-four.) But the other objective measure that determined eligibility for the promotion was the candidates' education and experience. On that measure, Watkins outscored Rivas—forty-eight to forty-two. Watkins had been with the city since 1992, while Rivas started in 2010.[7] Watkins earned a degree in automotive and diesel mechanics, while Rivas had a high school diploma only. Watkins notes by the time Rivas graduated from high school and started working construction, Watkins had accumulated two decades of experience operating construction and maintenance equipment. Looking objectively at their experience and education, Watkins asserts he was the more qualified candidate. *See Cox*, 792 F.3d at 939 (requiring applicant to show employer hired less qualified applicant to support finding of pretext).

Plus, it was not those preliminary objective criteria that mattered in the final promotion decision. In her affidavit, Thies stated the interview scores were "quite important" in selecting the section chief. In fact, she said the "sole basis" for the

---

[7] Rivas did have relevant experience in residential construction before coming to work for the city.

panel's recommendation of Rivas over the other candidates, including Watkins, was his top performance in the interviews. But contrary to the city's assertion, the numerical character of the interview "score" does not diminish the subjective nature of the scoring—each interviewer based their score on their subjective impressions of the interviewee's answers. Given that record, we find the city relied exclusively on the subjective interview process to reach its promotion decision. Because subjective considerations are "easily fabricated," the interview process here may give rise to an inference of discrimination. *See Wingate*, 528 F.3d at 1080.

To support that inference, Watkins points to statements by two members of the three-person interview panel that bear on the city's discriminatory motive. "In a claim of disparate treatment in employment, proof of the employer's motive is critical." *Hamer v. Iowa Civil Rights Comm'n*, 472 N.W.2d 259, 263 (Iowa 1991). Because an employer will rarely announce its discriminatory motive, "evidence concerning the employer's state of mind is relevant in determining what motivated the acts in question." *Id.* That relevancy exists even when the timing of the statements does not coincide with the adverse employment action. *See id.* (discussing relevance of prior acts by supervisors).

The first discriminatory statement, as recounted above, was Chiodo's admitted use of the term "monkey" to express his displeasure with a proposal by Watkins in February 2014. To be sure, the two men differ in describing the context. Watkins recalled Chiodo calling him a "monkey." If true, the epithet was "appalling" and "reasonably understood to have no other purpose than to express racial animus." *See Canady v. John Morrell & Co.*, 247 F. Supp. 2d 1107, 1119 (N.D. Iowa 2003). Chiodo offered a more innocent telling, insisting he said the work crew

should not be "jumping around like monkeys."  But ours is not to pick which version is more believable.  *See Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 776 (Iowa 2010) (noting credibility assessments are not part of summary judgment process).  Viewed in the light most favorable to Watkins, Chiodo's "monkey" statement made just a few months before the interviews, gives rise to an inference of racial discrimination.

Adding to that inference was the banana-peel incident reported by Watkins on the same day as the "monkey" comment.  According to Watkins, section chief Desio threw a banana peel near his feet as he got up from his desk, prompting Chiodo to "snicker" like "a little kid."  *See Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1236 (D.C. Cir. 1984) (finding fact supervisor laughed at racist joke could be evidence of discriminatory motive).  Chiodo acknowledged Watkins reporting the incident but denied witnessing it.

The second discriminatory statement carries even more weight because it came from Thies, the key decision-maker on the interview panel.  Thies invoked the racist term "Stepin Fetchit," an insidious stereotype of African-American men as lazy and self-demeaning, when criticizing an ineffectual worker.  Thies later claimed she did not know the term's negative connotations.  But the African-American employee who leveled the complaint recalled that she prefaced her own statement with a disclaimer showing her understanding of the derogatory nature.  We understand Thies made the comment more than two years after the interviews.  But that timing does not erase its potency.  *See Hamer*, 472 N.W.2d at 263.

Giving no ground, the city characterizes the statement from Thies as a "stray remark" insufficient to establish discriminatory animus.  *See Hedlund*, 930

N.W.2d at 722. It is true that derogatory statements by someone who is not involved in making the employment decision at issue are not evidence that the decision was discriminatory. *See Rozskowiak* v. *Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005). But here, Watkins established a link between the alleged bigotry and the adverse employment action. *See Christie v. Crawford Cty. Mem'l Hosp.,* No. 17-0906, 2018 WL 3471835, at *3 (Iowa Ct. App. July 18, 2018) (holding derogatory comments by decision maker were evidence of a possible discriminatory motive).

Drawing all inferences in Watkins's favor, we find there is a genuine issue of material fact whether the city's nondiscriminatory reason for denying his promotion was pretextual and that racial discrimination was the real reason he was not elevated to section chief. Accordingly, the city is not entitled to judgment as a matter of law on this promotion claim.

We do not reach this determination lightly. We understand our court is not equipped to be a "super personnel department that second-guesses employers' business judgments." *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016). But here two of three members of the interview panel uttered statements at work that revealed an implicit, if not explicit, bias toward their African-American employees.[8] The scoring of the interviews was subjective—left in the hands of those decision makers. So by presenting evidence of those statements, Watkins

---

[8] The city emphasizes that Watkins considered the third interviewer, Smith, to be a respected coworker who never engaged in racial discrimination. Because of the subjectivity involved in the interview scoring process, and the testimony the decision was ultimately made by Thies, we don't believe Smith's consensus with the other two interviewers defeats Watkins's claim.

created a question for the jury whether the city's legitimate reason was pretext for discrimination. "Without expressing any view on the merits of the issue, we must agree that this was essentially a factual dispute." *See Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1413 (10th Cir. 1984); *see also Rodriguez v. Bd. of Ed. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 367 (2d Cir. 1980) (by submitting affidavits rebutting employer's professed innocent motives, employee presented triable issue of fact that should not have been resolved by summary judgment).

### 2    *Motivating Factor*

We reach the same result when we analyze the summary-judgment question under the motivating-factor test. If Watkins's race was a motivating factor in the city's decision not to promote him, the city engaged in unlawful discrimination. *See Nelson v. James H. Knight DDS, P.C.*, 834 N.W.2d 64, 67 (Iowa 2013). Watkins contends—given his credentials—he would have been promoted to the position of sections chief if he were not African-American. We find a triable issue of material fact whether impermissible bias based on Watkins's race—as expressed by Chiodo and Thies—was a substantial factor in the city passing him over for a promotion.

### B.    Hostile Work Environment

Watkins next alleges discrimination based on a hostile work environment. To establish a hostile work environment, Watkins must show: (1) he belongs to a protected group; (2) he faced unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment. *See Farmland Foods, Inc. v. Dubuque*

*Human Rights Comm'n*, 672 N.W.2d 733, 744 (Iowa 2003). Watkins presented enough evidence to create a jury question on the first three elements.

But he falls short on the fourth element. To prove the harassment affected a condition of his employment, Watkins must show it was so severe that his workplace was permeated with "discriminatory intimidation, ridicule, and insult." *See Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 468 (Iowa 2017). To decide whether a worker can meet that test, we ask four questions. (1) How frequent was the conduct? (2) What was the level of severity? (3) Did coworkers use physical threats or humiliation or was their conduct "merely offensive"? And (4) did the harassment interfere with the employee's job performance? *See Farmland Foods*, 672 N.W.2d at 745.

No question, Watkins chronicled offensive conduct by coworkers. The doll-lynching fit that bill. And it could be considered borderline-threatening when coupled with Kozitza's statement in the same time frame that if Watkins could not operate a truck by himself, "we're going to hang him." But those incidents occurred twelve years before Watkins sued. The smattering of other conduct that Watkins considered harassing did not happen with enough frequency to create a hostile work environment, as that term has been defined. *See id.* at 744 (explaining these "claims by their nature involve ongoing and repeated conduct, not isolated events"). Even when viewed in the light most favorable to Watkins's claim, we find no triable issue of fact on his allegation of a hostile work environment. The district court properly granted the city summary judgment on that issue.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**