Ronald G. BARDING, Plaintiff,

v.

BOARD OF CURATORS OF LINCOLN UNIVERSITY, James Frank, Gerald Brooks, O. J. Chapman, Gossie Hudson, Wm. K. Barnett, Defendants.

No. 76CV–217–C.

United States District Court,
W. D. Missouri, C. D.

Aug. 26, 1980.

Kenneth M. Chackes, St. Louis, Mo., Gary Oxenhandler, Columbia, Mo., for plaintiff.

Michael L. Boicourt, Joel Wilson, Jefferson City, Mo., for defendants.

## OPINION

ELMO B. HUNTER, District Judge.

Plaintiff Barding, a caucasian, was employed by the defendant Board of Curators of Lincoln University from September, 1970 until December 31, 1975, as a full–time faculty member in the Department of Sociology. On December 14, 1974, the Board of Curators voted to terminate Mr. Barding as of December 31, 1975.

On November 4, 1976, Ronald G. Barding filed his complaint against the Board of Curators of Lincoln University and also against five members of the University faculty in their individual capacities, including the university president.[1] Plaintiff's complaint alleged that defendants engaged in unlawful employment practices by (A) unlawfully discriminating against plaintiff because he opposed their discrimination against others on the basis of race; (B) [Conspiring to and] unlawfully discharging plaintiff because of his race; and (C) maintaining policies and practices with respect to terms and conditions of employment which unlawfully operate to deny equal employment opportunities to caucasian citizens because of their race; invoking jurisdiction under 28 U.S.C. §§ 1343, 2201 and 2202, and, 42 U.S.C. §§ 1981, 1985 and 2000e, *et seq.*, as amended.

In addition to their answers, defendants filed motions to dismiss plaintiff's Title VII claim for failure to allege a *prima facie* case of discrimination and on the ground of official immunity. Defendant Barnett filed a separate motion to dismiss on the grounds of *res judicata* and collateral estoppel. All motions were presented, considered, and denied for the reasons stated in the overruling orders, and the case was set for trial on the merits on June 16, 1980.

### The Jury Trial

The trial was bifurcated. All jury issues were presented in the nine day jury trial which began on June 16, 1980.[2] As a result of that trial, requiring sixteen forms of verdict, the jury found in favor of all defendants and against plaintiff Barding on all issues that Mr. Barding requested to be submitted to the jury.

### The Court Trial

The only remaining issues for court determination are the claims of plaintiff

---

1. The official Board of Curators is a public entity organized and operating under the laws of the State of Missouri, Chapter 175, RSMo. Defendants' motion to dismiss plaintiff's claims for money damages under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 against the Board of Curators on the ground that such claims are barred by the Eleventh Amendment of the Constitution of the United States was granted prior to trial.

2. Plaintiff's counsel carefully and accurately described to the jury in his closing argument plaintiff's jury claims as follows: "Mr. Barding has four claims against the defendants. First, he claims that his discharge was because of his race; because he is white. That claim can be decided against any or all of the five individual defendants (Dr. James Frank, President of Lincoln University; Dr. William Brooks; Dr. Gossie Hudson; Dr. William Barnett and Dr. Oscar Chapman). Mr. Barding's second claim is that he was discharged because he exercised his right under the First Amendment to the United States Constitution of free speech motivated by his religious convictions. Mr. Barding ex-

pressed his ideas, his beliefs and opinions about racial discrimination at Lincoln University. Again, that claim that he was discharged because he exercised his First Amendment rights of free speech can be decided against any or all of the five defendants. Third, Mr. Barding claims that his discharge was the result of a conspiracy among the five defendants to discharge him because of his race and because of the exercise of his First Amendment rights of free speech. On that claim, a verdict can be rendered against any or all of the five defendants you believe participated in such a conspiracy. And, finally, Mr. Barding's fourth claim is that his due process rights were violated by the president of the university, Dr. Frank, in connection with the procedures that were undertaken in connection with his discharge." As earlier noted, based on its consideration of the evidence adduced during the nine day trial, the jury returned unanimous verdicts in favor of defendants and against plaintiff Barding on all jury submitted issues.

Barding for equitable relief, including restoration of his job and back pay, based on Title VII, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. 1981 and 1983 and the First Amendment to the United States Constitution. The defendants have moved for summary judgment on the ground that all factual findings relevant to plaintiff's Title VII claim have already been found adverse to Mr. Barding's position by the jury verdicts of June 26, 1980. Thus, say defendants, by virtue of the doctrines of *res judicata* and collateral estoppel, the defendants are entitled to summary judgment as a matter of law as to all remaining issues in the cause before the Court.

However, the Court prefers to reach and decide all court issues on the merits, rather than address the more difficult and elusive matter of the summary judgment motion.

A brief overview of the lengthy evidence will suffice to indicate the Court's findings and decision on the Title VII claim.[3]

Plaintiff Barding arrived at Lincoln University in the summer of 1970 and was hired as an Assistant Professor of Sociology by the then President of the University, Dr. Walter C. Daniel. During the first two years of his employment Barding experienced no substantial problems. Lincoln University, located in Jefferson City, Missouri, prior to 1954 had been an all black land grant college. Commencing in 1954, as required by law, it gradually changed to the point that, broadly generalizing, its faculty and students were 50% white and 50% non-white. As descriptive of its black background, it was referred to in evidence as a black heritage college.

Dr. Oscar J. Chapman, (black) a defendant, held the position of Administrative Dean at Lincoln University from mid–1966 through July 31, 1973, when he left for other employment in another state. Noting that the Sociology Department had changed department heads three times in three years, Dr. Chapman recommended to President Daniel in the summer of 1972 the hiring of Dr. William Barnett (white) to head up the Sociology Department. On being so employed, Dr. Barnett recruited and employed a former student of his, Mr. Craig Sturdevant (white) to be an instructor in the Department of Sociology. The only person employed in that department at that time, other than Dr. Chapman, Mr. Barding and Mr. Sturdevant, was a part–time instructor, Mr. Robert Parker (black) who taught one course.[4]

While nothing special occurred prior to the summer of 1972, it was clear that Dr. Chapman was dissatisfied with Mr. Barding's teaching credentials and actions from the very beginning of Mr. Barding's employment. He believed that Barding's teaching credentials had not been checked into sufficiently by former President Daniel, and that Daniel had employed Mr. Barding with little or no knowledge of his past. He also was concerned that Barding had practically no credit beyond a master's degree.

### The Chapman Letters

Dr. Chapman was concerned that there was no full–time black teacher in the Sociology Department. He believed that one was needed to give a more balanced view of the sociology courses which involved much social history. His black students expressed to him often that they felt the need for a full–time black teacher in the department, and that a diversified racial composition of the faculty would be of benefit. They said they needed someone with whom they as blacks could identify.

---

**3.** The parties stipulated to a great many facts in their eight–page stipulation filed on March 2, 1979. The Court, of course, has accepted and considered all of those stipulations as facts of the case. However, those facts are set out in this opinion only to the extent necessary to explain the decision.

**4.** According to the parties' stipulation, there was a black, Mr. Samuel Toye, who during the academic year 1973–74 was a part–time instructor in the Department of Sociology. His position and activities were very minor.

On July 24, 1972, Dr. Chapman wrote a letter to defendant Dr. Gossie Hudson[5] (black) saying, "Since Dr. Barnett is white, I do not believe that he really knows where Negro teachers of sociology are located. Therefore, I suggest you compile a list of eight to ten black sociologists with master's degrees and send their names and addresses to Barnett for his consideration and selection. However, I suggest that you do not mention the applicant's racial identity unless Barnett brings the issue up first. If you send Barnett such a list of black teachers of sociology, he almost has to select one of them to recommend to you and to me. * * * "

Later, in November, 1972, Dr. Chapman again wrote Dr. Hudson as follows: "Dear Dr. Hudson: The enclosure is sent for your information only. Mr. Plumer Johnson is a Negro. However, the only way we can employ him, or any other black teacher in the Department of Sociology is for you and Dr. Barnett to agree not to recommend Mr. Sturdevant for reappointment for the 1973–74 school term. By doing this, and both of you should concur in this matter, a vacancy will be created in this department. Our 1973–74 budget, if it is approved by the '73 Session of the General Assembly, does not include any funds to add another Sociology teacher. But if a vacancy should occur, we could fill it by employing a new teacher."

In March of 1973 Dr. Chapman wrote a third letter on the subject to Dr. Hudson, stating: "Begin searching now for a black sociologist, and we must add another black teacher in this department." In April, 1973, Dr. Chapman wrote again to Dr. Hudson, saying: "Get a lead on two or three black persons with a Master's Degree in Sociology." And on June 19, 1973, Dr. Chapman wrote his final letter to Dr. Hudson on the subject saying, "You and Dr. Barnett may now proceed to finalize, and you send me with your endorsement the credential folder of an additional full–time black teacher in sociology."

By July 9, 1973, those four letters had come to the attention of Mr. Barding, through his personal friend and fellow member of the Bahia faith, Mrs. Epstein, who was Dr. Hudson's secretary. In early December, 1972, Barding told Sturdevant about the November 28, 1972, letter that implied Sturdevant was to be let go to make room for a black.[6] Sturdevant was very upset and quickly told Dr. Barnett about the contents of the November 28, 1972, letter. In turn, right after Christmas in 1972, Dr. Barnett went to Dr. Hudson and told him of his conversation with Mr. Sturdevant, and that Mr. Barding, through Dr. Barnett's secretary who was a friend of and fellow Bahia with Mr. Barding, had possession of copies of the letter.

*The July 9, 1973 Letter of Mr. Barding*

By July 9, 1973, Mr. Barding was convinced that his own teaching position was in some peril. He, together with Mrs. Epstein, composed and sent a letter to Dr. Frank advising of the earlier letters of Dr. Chapman and charged that racial discrimination was ongoing at Lincoln University. It is Mr. Barding's position that this letter written in the exercise of his First Amendment rights was a substantial factor in his later discharge.

*The Conflict Between Mr. Barding, Dr. Barnett and Other Staff*

When Dr. Barnett arrived in the summer of 1972 he reviewed the Department of Sociology with the intention of upgrading it into a first–rate department. At first, according to Dr. Barnett, he and Mr. Barding

---

**5.** At that time Dr. Gossie Hudson held the position of Social Science Division Chairperson (from summer session of 1972 through May, 1977).

**6.** It is clear from the record that Mr. Sturdevant was a very good teacher, and was recognized as such by the other faculty members. Mr. Sturdevant's supervisor, Dr. Barnett, recommended through channels his reemployment. Dr. Chapman joined in the recommendation which was passed on to the president and Mr. Sturdevant was reemployed. He remains an employee to this date. The mentioned black sociologist was never hired. No one ever carried out Dr. Chapman's suggestions or directions contained in his letter.

got along all right. They had coffee together in each other's offices and were friendly. A number of events caused that relationship to change. One early event in particular occurred during a car ride they shared to Columbia, Missouri and back. A heated argument between them developed over appropriate training and teaching approaches in sociology. Mr. Barding stressed that students should be required to accept one point of view of the course as presented by the professor, to defend the professor's point of view, and, yet, to think for himself. Dr. Barnett felt more than one point of view should be presented to the students to give them a wider knowledge of the subject. Their satisfactory early relationship became acrimonious. Dr. Barnett became aware of the fact that Mr. Barding possossed only a very few hours of education beyond his master's degree. He felt that Mr. Barding taught too narrowly, using only one somewhat restricted sociology theory. He sensed that Mr. Barding was not keeping up in his field; did little reading and research in it; did no writing and was not attending seminars to increase his exposure to changes in his field. Dr. Barnett also learned that Mr. Barding belonged to none of the sociological organizations available to teachers of that subject; he subscribed to none of the sociological journals and did not know what the library had to offer on the subject. Also, Mr. Barding failed to go to official school receptions such as that given by the president, or to graduation exercises, but, rather, "made fun" of them even though all the others in the department attended them to support the University and as a courtesy to the students and their parents.

Dr. Barnett, as a supervisor, was required to evaluate his faculty, including Mr. Barding. In his February 14, 1973, written evaluation he stressed, among other things, the need for Mr. Barding to obtain more graduate hours of schooling.[7] Dr. Barnett's report stated: 1. * * * Your training in sociology is very limited for a regular university position * * *. 2. * * * You are a controversial teacher * * *. You generate more complaints than any other teacher in the division. The content of such complaints revolves around such themes as unfairness, bias, dogmatism, arbitrariness, and inconsiderateness. * * * 3. As far as I can see, you participate little in professional association outside the immediate university and your publication activities during the past few years are absent. * * 5. No matter what the causal factor, your attitude and activities do cause problems for the department. * * * In spite of the reservations cited above I am recommending an across–the–board increase [in your pay] for next year." This evaluation was sent, among others, to Dr. Gossie Hudson, as Chairman, Division of Social Science.

Mr. Barding's oral response to the evaluation, according to Dr. Barnett, was to the effect that "there's nobody that can teach me anything in sociology"; that what his students thought didn't matter; and that "he seemed to delight in it." After the February 14, 1973, evaluation Mr. Barding directed Dr. Barnett not to use his coffee pot. Their coffee break office visits ceased.

Dr. Barnett required all of the Sociology Department teachers to prepare a "syllabus" of their course at the beginning of each year showing what each professor intended to teach. Mr. Barding prepared only a skeleton one, not sufficient to meet the expectations of Dr. Barnett, although the others in the department prepared satisfactory ones.

Dr. Barnett became more insistent that Mr. Barding use his summers by "going back to school" to take graduate courses in sociology. He suggested to Mr. Barding that he attend seminars and do some writing. Finally, seeing that Mr. Barding was not responding, he advised that he was issuing a departmental regulation requiring all his department (Barding being the only one really affected as Mr. Sturdevant and Mr. Parker agreed to take summer schooling) to take graduate work in the summer of 1973. Mr. Barding's response was that Dr. Bar-

---

7. Dr. Barnett testified that this evaluation ended their prior but eroding relationship.

nett could not put that requirement on him as he was tenured.[8]

On July 9, 1973, Mr. Barding had a motorcycle accident and was hospitalized for a number of days. Dr. Barnett took over his classes. As a result Dr. Barnett learned that Mr. Barding's grading system violated university regulations. Students who received exactly the same test grades were given substantially different final grades. One student had an understanding with Mr. Barding that he was to receive an "A" no matter what he did in the course. Mr. Barding had a policy of giving one grade higher to foreign students than they earned, a violation of university policy. Mr. Barding's text books and other class material were "out of date". Some students personally complained of some of Mr. Barding's methods of teaching, relating that he used a "shock treatment" approach involving crude and indecent language, and verbal abuse among other things.[9] Dr. Barnett lost no time in informing Mr. Barding that these practices would not be tolerated. Mr. Barding made it equally clear to Dr. Barnett that he wasn't going to make any changes.

The lines were drawn, for as stated in a letter from Dr. Barnett to his department staff dated July 18, 1973, "failure to comply with this demand (of higher education) will result in automatic dismissal." Mr. Barding's problems with his superiors at the departmental and divisional levels had reached a crisis level. At one of the departmental meetings on November 13, 1973, Mr. Barding strongly opposed Dr. Barnett's efforts to upgrade his department with this continuing or additional educational requirement, and Mr. Barding referred to his colleagues who were going along with Dr. Barnett's request as "ass–lickers and sycophants." Shortly thereafter, and on November 15, 1973, Mr. Barding went to Dr. Barnett's office to express his opposition to the way the minutes of the meeting had been written by Dr. Barnett, and again an argument between them ensued in which, according to Dr. Barnett's testimony, Mr. Barding became loud and abusive and threatened Dr. Barnett with physical violence. Two other persons who heard only a portion of the event related that it was Dr. Barnett's voice that seemed to be the loudest and angriest of the two. Whichever version was true it was indelibly clear that there was no reasonable hope that the two men could ever work out their differences.[10] Dr. Barnett formally called for Mr. Barding's termination from employment in a letter to Dr. Hudson on November 15, 1973. He later supported it with an "Anecdotal Record of Events."

### The Formal Charges

On November 25, 1973, Dr. Barnett completed the first installment of his "Anecdotal Record of Events" relating to the performance and evaluation of Barding. The second and third installments were completed on December 15, 1973, and March 20, 1974. This "Record" detailed all of the complaints he had against Barding and described the events involved. In part it stated, "1. Professional Incompetence–lacks depth and breadth of training in his field and is hopelessly out of date. Refuses to

---

**8.** There was a substantial question as to whether such a requirement could be made mandatory rather than just "expected". Mr. Barding went to Dr. Brooks who advised him that no university regulations authorized a continuing educational requirement. Mr. Barding, so reenforced, expressed strong opposition to Dr. Barnett's attempt to require him to undertake higher education.

**9.** They state they were requested to publicly reveal their participation in sexual activities by a show of hands in response to Barding's questions, e. g., if they masturbate and if they engage in sexual intercourse ("getting it").

**10.** There were many other somewhat daily occurrences between the two men that added fuel to their intense mutual dislike of each other. It would serve no purpose to detail them in this opinion. Some of them resulted in official reprimands of Mr. Barding by Dr. Barnett which Mr. Barding did not appeal. Mr. Sturdevant who was aware of many of them testified, "There was a strong clash of personalities; somebody had to go. * * * The Department was falling apart." The final event, according to the testimony was a threat from Mr. Barding of personal injury to Dr. Barnett.

obtain further training at the formal level and further, refuses to engage in these activities such as professional associations which could bring him current informally. 2. Teaching incompetence–Refuses to provide a broad coverage of theoretical perspectives. Tells students not to buy books. One semester assigned but thirteen pages for an entire three–credit course. Students come out inadequately prepared. Test questions are old and used again and again * * *. 3. Abuse of students. Individually and collectively, in private and in public regularly abuses students and fails to treat them with the kind of respect they deserve. * * * 6. Refused to follow university rules and department directions. Frequently and willfully he refused to obey the rules and regulations of this institution at all levels of organization, i. e., Board, President, Administrative Dean, Division and Department. . . . Moreover, even when reprimanded for an obvious act of disobedience, his letters indicate clearly he feels he is above such rules." [11]

On December 12, 1973, Dr. Barnett informed Mr. Barding that he was submitting a recommendation to Dr. Hudson for Mr. Barding's termination.

11. The anecdotal record contains fourteen sub heads of various kinds of charges made against Mr. Barding by Dr. Barnett.

12. President Frank's letter read in part: "I have received a recommendation from your department chairman and divisional chairman that you be dismissed as a tenured Assistant Professor in the Department of Sociology, Anthropology, and Social Work. Since you are a tenured professor and your instructive competence is being questioned, I wish to inform you that you have the right to appeal the decision made by your supervisors. In addition you have the right to ask for a faculty board of review. The rules governing cases of this nature are set forth in Section D, page 34 of the Rules and Regulations Affecting Lincoln University."

13.        STATEMENT OF CHARGES

1. Professional Competence
   Ronald G. Barding

   a. lacks depth and breadth of training in his area of specialization. He has completed 27 semester hours of sociology at the under graduate level, graduating in 1961, and 22

On December 14, 1973, Dr. Hudson in a letter to Dr. Brooks concurred in Dr. Barnett's recommendation to terminate Mr. Barding. That concurrence was devoid of anything relating to race, religion or to an exercise of Mr. Barding's First Amendment constitutional rights.

On December 14, 1973, Dr. Brooks in a letter to President Frank concurred with Doctors Hudson and Barnett in the recommendation to Dr. Frank to terminate Mr. Barding. Again that concurrence was devoid of anything suggesting that it involved any racial, religious, of First Amendment or other constitutional right.

On December 22, 1973, President Frank wrote to Mr. Barding informing him of the recommendations to terminate him, and of his right to appeal and his right to a Faculty Review Board.[12] And on January 7, 1974, Mr. Barding wrote to President Frank to appeal the recommendations of his termination and to ask for the appointment of a Faculty Review Board.

On March 8, 1974, President Frank sent to Barding the "Statement of Charges" against him.[13]

semester hours of sociology at the graduate level, completed July, 1963;
b. has failed to upgrade his sociological competency by additional study since completing his master's degree, by recent attendance at professional meetings or conferences or by research;
c. uses teaching techniques which limit or forbid freedom of inquiry and expression by students;
d. utilizes course content and text which are outdated and irrelevant.
2. Professional Behavior
   Ronald G. Barding
   a. lacks respect for students, faculty, and administrators as individuals, is abusive individually and collectively;
   b. uses foul and offensive language in his classes;
   c. has been rude, inconsiderate and vulgar with the divisional chairman, department head and faculty.
3. Professional Responsibility
   Ronald G. Barding
   a. has repeatedly refused to follow the policies set forth in the Rules and Regulations and the Faculty Handbook of Lincoln University, to wit: by failure to regularly attend

On March 25, 1974, Mr. Barding submitted a written response to the Statement of Charges. Events indicated a crisis had been reached. Dr. Frank issued his guidelines outlining the procedures to be followed in the termination, including the preparation of an anecdotal record. In five more days the first installment of the anecdotal record was prepared by Dr. Barnett,[14] which received the approval of Dr. Hudson and Dr. Brooks.

## The Board of Review

Dr. Frank appointed a faculty Board of Review[15] under the University's bylaws. Its purpose was to investigate the events surrounding a recommendation of termination of a faculty member and to report its conclusions to the president of the University who in turn would recommend to the Board of curators of the University what he believed was appropriate under the circumstances. Dr. Frank also appointed a so-called "outside consultant" to determine Mr. Barding's competence to teach, and to work with the Board of Review in its investigation and considerations. John Mitchell of Westminster College, Fulton, Missouri, a person unknown to Dr. Frank was appointed. Mr. Mitchell was a longtime, dedicated member of the A.A.U.P. He hoped to terminate the matter through reconciliation. He urged the retention of Mr. Barding. He was unable to reach and report any conclusion as to Mr. Barding's competency to teach. It was clear that generally he did

not believe in firing teachers who had tenure. His views influenced the Board of Review in its recommendation that Mr. Barding not be discharged for his actions.[16]

Dr. Frank received the Board of Review Report and gave it long and serious consideration. He disagreed with its findings and conclusions. In his letter to Mr. Barding on December 3, 1974, on the subject he stated his reasons for his disagreement with the Board of Review Report and his reasons for recommending to the Board of Trustees termination of Mr. Barding's employment. He advised Mr. Barding that he would recommend his termination to the Board of Curators at their meeting on December 14, 1974.

## The Board of Curators Hearing and Findings

As earlier noted, Dr. Frank had advised Mr. Barding of his recommendation of dismissal to the Board of Curators and also had advised him of the date of its meeting and that he had a right to appear before that Board and be heard. Mr. Barding then employed counsel and together with his counsel appeared before the Board of Curators on December 14, 1974, and with the assistance of his attorney made a brief presentation of his side of the matter. He was given as much time as he wished for his presentation and was aware of the opportunity to present any witnesses or testimony he desired.[17]

---

divisional and department meetings; failure to follow or use the departmental form for student evaluations, failure to provide course syllabi and failure to order library books and periodicals.

14. By this time Dr. Barnett was obviously totally frustrated by Mr. Barding, who continued to defy his superior on a number of requests and orders. Dr. Barnett felt Mr. Barding was unprofessional, was abusive, threatening to his supervisor (Barnett), vulgar in calling him a liar and calling his colleagues "ass lickers" and "sycophants". His prepared anecdotal record reflected his feelings and in some respects as shown by the evidence, contained exaggerations and overreactions. However, much of it was supported by the evidence.

15. From June 17-25, 1974, the faculty Board of Review met and took testimony. On July 30,

1974, it completed an initial draft of its report, and on October 7, 1974, it adopted this initial draft as its Final Report.

16. The Board of Review never approved of Mr. Barding's *professional behavior*. Those who testified expressed their disapproval of many things that Mr. Barding did. They categorized his actions in some instances as unprofessional, uncooperative, disruptive and discourteous. They suggested he go back to school. Yet, obviously influenced by Mr. Mitchell's philosophy, they didn't feel that on the whole the grounds were sufficient for termination.

17. The Board of Curators was then composed of several outstanding lawyers and one state court judge. These members were knowledgeable as to what was necessary to fully afford a due process hearing to Mr. Barding. While Mr.

The Board of Curators found that Mr. Barding was incompetent, unprofessional in his teaching and conduct, and that his actions were such that his termination was fully justified on the grounds of unprofessional conduct.[18] The Board further found against Mr. Barding on his various contentions and ordered that his employment be terminated on December 31, 1975, in order to give him approximately one year to find other employment.

In reaching its decision the Board of Curators had before it a substantial amount of evidence including the Faculty Board of Review Report; President Frank's response to the Faculty Board of Review Report; the Anecdotal Record by Dr. Barnett; President Frank's recommendation (letter to Barding dated December 9, 1974); Mr. Barding's response to that letter (December 9, 1974, letter); Mr. Barding's document prepared for submission to the Board of Curators, titled "Summary of Major Events: An appeal" and several other evidentiary matters.

### The Law

The law applicable to this case and its issues is well settled. The following cited cases and pertinent extracts from them illustrate the controlling principles.

■ In *Coleman v. Missouri Pacific Railroad Company*, 8th CCA, 1980, 622 F.2d 408, 410, the Court stated, "In a Title VII case, the plaintiff must first demonstrate a prima facie case of discrimination based on one or more specified classifications, including gender. The defendant employer then has the burden of 'articulating' a legitimate nondiscriminatory reason for its action. If

this is done, the plaintiff may then show that the articulated reason is really a pretext for what is in reality an illegal discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." The Court also stated "an impermissible discrimination exists even if bias is merely a contributing factor rather than the sole factor in the employer's decision. *Barnes v. Costle*, 561 F.2d 983, 990–92 (D.C.Cir.1977); *Gillin v. Federal Paperboard Co.*, 479 F.2d 97 (2d Cir. 1973); *Sprogis v. United Airlines, Inc.*, 444 F.2d 1194, 1198 (7th Cir.), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); *Saracini v. Missouri Pac. R.R.*, 431 F.Supp. 389–394–95 (E.D.Ark.1977)."

■ And as noted in *Ligons v. Bechtel Power Corporation*, 8th CCA, June 16, 1980, 625 F.2d 771, "The employer as a Title VII defendant need not 'prove absence of discriminatory motive to escape liability; a prima facie showing of disparate treatment shifts only the burden of producing evidence to the employer, not the burden of persuasion.'" See *Womack v. Munson*, 8th CCA, 1980, 619 F.2d 1292.

In this case the defendants have provided highly creditable evidence that the bases given for the discharge of plaintiff Barding by the Board of Curators at Lincoln University and for the recommendation that he should be discharged given to the President by several of the defendants, were based on legitimate, nondiscriminatory reasons for the discharge and were not merely pretextual.

The following additional findings of fact when applied to the provisions of Title VII and to the case law above cited inevitably

---

Barding made some later complaints of lack of due process, the trial evidence strongly supports this Court's finding that Mr. Barding and his counsel were afforded full due process at all stages of the Board of Curators' hearing. Mr. Barding received a full, fair and considerate hearing.

18. Mr. Joseph McDuffie, then president of the *Board of Curators* testified that there was no discussion of race or religion by the Board; that Mr. Barding was discharged "on the basis of his performance as an employee of the Uni-

versity." Other evidence made it clear that Mr. Barding was discharged on the ground of "*unprofessional behavior*". It is noteworthy that Dr. Cletus Stamper, Chairman of the *Board of Review* testified that the Board of Review voted 3 "yes" and 2 "no" on the charge that Mr. Barding lacked professional responsibility, but also voted 4 to 1 that his lack of professional responsibility was not sufficient grounds for his discharge. On the charge of unprofessional behavior the Board of Review voted 2 to 2, with 1 vote undecided.

result in a finding against plaintiff Barding and in favor of all five of the individual defendants on all claims tried to the Court.

*Additional Findings and Conclusions*

It is the finding of this Court that:

(1) Although Dr. Chapman through his letters and conduct in 1972 until he left the University on July 31, 1973 was requesting Dr. Barnett, Dr. Brooks and possibly others to take action leading to the termination of the employment of Mr. Sturdevant by not renewing his one year employment contract to make room for the employment of a black in the Sociology Department, nothing ever came of that request. There is no evidence to support a finding that any of the other five defendants ever took any action adverse to Mr. Sturdevant and his employment.

(2) While a few of the early events leading to Mr. Barding's discharge occurred during that period of time that Dr. Chapman was seeking to hire a full time black employee in the sociology department, the desire to place a black in the sociology department in actual fact played no part in the discharge of Mr. Barding from his employment.

(3) The discharge of Mr. Barding from his employment was the combined result of the personality conflict between Mr. Barding and Dr. Barnett, and the open defiance by Mr. Barding of his superiors as well as the unprofessional conduct of Mr. Barding in carrying out his teaching duties.

(4) Mr. Barding's discharge was not the result of any religious or racial bias on the part of any of the five defendants, and was not in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended, nor in violation of 42 U.S.C. 1981.

(A) The fact that Mr. Barding is a white (Caucasian) had nothing to do with his discharge.

(B) Mr. Barding's discharge was not the result of any conspiracy or action on the part of any of the five defendants to bring about his discharge.

(C) The fact that Mr. Barding was a member of the Bahia faith had nothing to do with his discharge.

(5) There was no violation on the part of any of the five defendants of any First Amendment right of Mr. Barding. Nor was there any violation by any of the five of Mr. Barding's exercise of his First Amendment rights by his writing and dissemination of the July 9, 1973, letter charging racial and religious bias on the part of certain members of the Lincoln University faculty.

(A) Mr. Barding's discharge was not the result of any retaliation or attempted retaliation on the part of any of the five defendants for any of Mr. Barding's letters or other actions or conduct, including his oral statements in which he charged or suggested racial or religious bias on the part of Lincoln University, its Board of Trustees, its president, or any of the five individual defendants Dr. James Frank, Dr. William Brooks, Dr. Gossie Hudson, Dr. William Barnett and Dr. Oscar Chapman.

(B) Nor was Mr. Barding's discharge the result of any retaliation or attempted retaliation against Mr. Barding by any of the defendants in this case arising out of or because of Mr. Barding's exercise of his First Amendment rights.

(6) Mr. Barding was accorded due process both procedurally and substantively by Dr. Frank and by the Board of Curators of the University at all stages involved in the charge, hearing and decision to discharge him.

(7) Mr. Barding's due process rights in connection with the procedures that were undertaken in connection with his discharge were not violated by any of the five defendants.

CONCLUSION

In accordance with the above findings it is clear that the credible evidence fully supports a finding against Mr. Barding on all aspects on his Title VII claims and his First Amendment violation claims and fully supports a finding on all claims of

Mr. Barding in favor of the five defendants: Dr. James Frank, Dr. William Brooks, Dr. Gossie Hudson, Dr. William Barnett, and Dr. Oscar Chapman. The Court after viewing all the witnesses and judging their respective credibilities, and considering all the testimony and evidence adduced at the trial does hereby find all of the issues against plaintiff Barding and in favor of the five above–named defendants and each of them. The Title VII claims and the First Amendment claims of plaintiff Barding are held to be without merit.[19]

Judgment is hereby directed against plaintiff and in favor of all of the named defendants in accordance with this Opinion.

IT IS SO ORDERED.

---

**19.** It is noteworthy that the jury reached a consistent and similar result in its verdicts with the finding and result reached by the Court.