**In the Interest of Kermit F. HOPPE, a child, Appellee.**

**STATE of Iowa, Appellee,**

v.

**Rita J. HOPPE, Appellant.**

**No. 63540.**

Supreme Court of Iowa.

March 19, 1980.

Judith O'Donohoe of Erb, O'Donohoe & Frye, Charles City, for appellant.

Michael K. Kennedy of Kennedy & Kennedy, New Hampton, for child, appellee.

Frank H. Holschlag, New Hampton, for State of Iowa, appellee.

Considered by REYNOLDSON, C. J., and HARRIS, McCORMICK, ALLBEE and LARSON, JJ.

HARRIS, Justice.

Rita Hoppe appeals from the termination of her parental relationship with her son, now ten years of age. On our de novo review we find the relationship was properly terminated because the evidence establishes Rita was "palpably unfit," within the meaning of section 600A.8(5), The Code 1977, to function as a parent. We affirm the trial court.

On December 15, 1967, when 15 years of age, Rita Hoppe was committed to the state juvenile home in Toledo as a dependent and neglected child. On February 7, 1969, she was moved to a group home in Des Moines and thereafter was referred to Goodwill Industries for training. She was thereafter dismissed from the training program for extensive absenteeism. It appears she also persisted in running away from the group home. On June 19, 1969, she was placed, in the status of a guest, in the girls' training school at Mitchellville. There she was discovered both to have developed certain schizophrenic features and to have become pregnant.

On August 22, again as a guest from Toledo, she was sent to the state mental health institute in Independence on com-

plaints from Mitchellville of what was termed her "bizarre" behavior. After treatment with pharmaceuticals Rita was, on December 10, 1969, permitted a trial visit to a foster home in Waterloo. On January 6, 1970, she was readmitted at the Independence hospital following a brief escape from the foster home.

On February 20, 1970, her son Kermit, the subject of these proceedings, was born at the University Hospitals in Iowa City. Rita then returned to Independence. On February 24, 1970, custody over Kermit was awarded to the department of social services with a view to placement in a foster home. Since a few days after his birth Rita has not seen Kermit.

By this time Rita was diagnosed to suffer from acute undifferentiated schizophrenia. Nevertheless on August 21, 1970, she was discharged to the custody of her parents in Cresco. Her parents died in 1971 and 1972.

On October 6, 1970, Rita married Richard McIntyre. On April 7, 1972, she entered the Winneshiek County home and stayed there and at the Clayton County home until August 21. She was treated with what were described as "rather large" doses of tranquilizers but remained intractable. She returned to the Winneshiek County home from January 15, 1973, until July 1. On March 7, 1974, her marriage to McIntyre was dissolved on McIntyre's petition because of her infidelity. Nevertheless the couple continued to live together, at least intermittently, until the time of trial. At trial Rita testified she plans to remarry McIntyre. McIntyre did not testify either to confirm the possibility of remarriage or to express any interest in Kermit.

In March 1974 Rita's sister, Laverne Roberts, was appointed her conservator to superintend the receipt of social security disability pension payments. The pension results from an adjudication that she is disabled by reason of her psychiatric condition.

Rita received homemaking services from the department of social services from May 7, 1974, to February 13, 1975, after which they were terminated because they were deemed futile. From June 6 to June 10, 1974, Rita was hospitalized for a physical condition unrelated to the claim of her unfitness. From April 22 to 25, 1975, she was against hospitalized perhaps because of that condition but perhaps because of a suicide attempt. On May 1, 1978, Rita moved to a farm residence near Lime Springs, Iowa. This was after her landlady in Cresco terminated her lease. She was again hospitalized with various complaints in May but discharged without a change in treatment.

On July 10, 1978, the Howard County department of social services received a child abuse report against Rita, based on the assertion she attacked and severely beat a young man. She is also said to have attacked McIntyre and several other men. In September 1978 she is said to have threatened the life of her conservator in connection with a violent attack after her sister declined a demand for money. One witness testified of his belief that, except for intervention by an observer, Rita would have killed her sister at this time. Mrs. Roberts has relinquished those duties and it was expected in October 1978 that Rita's brother, Earl Hoppe, would replace her.

Following the attack, Rita for the third time entered the mental health institute in Independence on September 22, 1978, and remained there until October 27. Now she was diagnosed to suffer from paranoid schizophrenia. It was recommended that custody over Rita be transferred to the community mental health center in Decorah. The record is unclear as to whether this was done but apparently Rita continued at the time of trial to receive biweekly injections of a tranquilizer.

As can be seen, Rita has been diagnosed as potentially or acutely schizophrenic since 1968. Foremost among her observed problems are her psychotic instability and aggressiveness. She has a general hostility toward males. The record is replete with complaints of her dismal neglect of personal hygiene. By her own admission Rita is also highly given to fantasizing and fabrication.

The evidence uniformly agrees on Rita's palpable unfitness to act as Kermit's moth-

er. She has been most equivocal in any expression of interest in Kermit. She apparently first expressed some interest in his custody in 1974 but stated during an interview that she would not be greatly upset if the relationship were terminated by these proceedings. More than that, she testified during these proceedings that she would in fact prefer visitation rights to custody.

I. Rita first challenges the admission into evidence of psychiatric and medical reports from Toledo, Mitchellville, Independence, and Decorah which contributed to the foregoing findings of fact. These documents were admitted pursuant to section 600A.7(2), The Code 1977. That section provided:

> Relevant information, including that contained in reports, studies or examinations and testified to by interested persons, may be admitted into evidence at the hearing and relied upon to the extent of its probative value. When such information is so admitted, the person sponsoring it or testifying shall be subject to both direct and cross-examination by a necessary party.

Rita's attack on the reports is threefold. She says there was no testimony of the reports by "interested persons" as required by the section. She also asserts that, if the section provides for their admission, her due process rights under the United States constitution have been violated. Finally, Rita asserts that certain testimony and part of the reports were admitted into evidence in violation of her physician-patient privilege under section 622.10, The Code 1979.

The first question under this assignment turns on a definition of the term "interested persons" in section 600A.7(2). Information from such things as psychiatric reports becomes admissible, under the section, when it is the subject of testimony by interested persons. Rita contends an interested person who can trigger the statute by testifying must be the one who actually prepared the report, or at least one who can supply the information required by section 622.28, The Code 1979 (business records). The State, on the other hand, argues for a broader concept of interest, broad enough to comprise the witnesses who testified in these proceedings. We upheld the constitutionality of similar sections in *In re Delaney*, 185 N.W.2d 726, 732 (Iowa 1971), and in *Orcutt v. State*, 173 N.W.2d 66, 74–75 (Iowa 1969). Contrary to Rita's contention, however, *Delaney* did not interpret the meaning of the term "interested persons." The meaning of the term is a question of first impression and is one of legislative intent.

We are bound to give words in a statute their ordinary meaning unless the legislature or the law has accorded those words some peculiar or other meaning. *City of Des Moines v. Elliott*, 267 N.W.2d 44, 45 (Iowa 1978); *State ex rel. Turner v. Drake*, 242 N.W.2d 707, 709 (Iowa 1976); § 4.1(2), The Code 1979.

The term "interested persons" is made up of two very ordinary and commonly understood words. The legislature gave them no special definition when it enacted the statute. The words, taken either separately or together, have no technical, legal meaning which calls for a different understanding than would result if the words were used in ordinary conversation. Rita in effect asks us to define "interested persons" as "authors of the reports." This is not the common meaning of the words. The legislature did not call for such an interpretation. And neither does the law. *See Minn. Public Interest v. Minn. Dept. of Labor*, 311 Minn. 65, 249 N.W.2d 437, 439 (1976).

We hold the term "interested persons," as used in section 600A.7(2), includes not only the authors of any of the reports but also the witnesses Fensterman (the Winneshiek County public health nurse) and Cross (a district adoption and foster care specialist with the Iowa department of social services). Both of these witnesses previously used the medical reports in connection with their official duties. The reports were prepared in part for such use. We hold this is enough to qualify them as "interested persons" within the meaning of the statute.

On appeal Rita also argues that section 600A.7(2) is unconstitutional under the Sixth and Fourteenth amendments because it denies her the right to confront and cross-examine. Although, as indicated, we ruled otherwise, *Delaney*, 185 N.W.2d at 729–733; *Orcutt*, 173 N.W.2d at 74–75, we choose to deny this challenge because it comes too late. Rita did not advance this point at trial. Having failed to do so she cannot raise it on appeal. *Estabrook v. Iowa Civil Rights Com'n*, 283 N.W.2d 306, 311 (Iowa 1979); *In Interest of Voeltz*, 271 N.W.2d 719, 722 (Iowa 1978).

The third and final challenge in Rita's first assignment is directed to the testimony and written report of Dr. V. G. Canganelli. Pursuant to court order Dr. Canganelli, a practicing psychiatrist, examined Rita on August 7, 1978. Although the record does not show it, Rita states on appeal that Dr. Canganelli also acted as her personal physician. The record before the trial court shows merely that Rita claimed a physician-patient privilege under section 622.10. On that basis she argued before the trial court and insists on appeal that the privilege extends, not only to what Rita herself may have communicated to Dr. Canganelli before the court-ordered examination, but also to information he received before August 7 from others through related discussions and review of their files. It is clear that a physician-patient relationship does not arise by reason of a court-ordered examination of the physical or mental condition of a defendant. *State v. Nowlin*, 244 N.W.2d 596, 602 (Iowa 1976); *State v. Mayhew*, 170 N.W.2d 608, 615 (Iowa 1969). In *Nowlin* we listed the elements which must exist in order for a physician-patient privilege to arise under section 622.10: "(1) the relationship of doctor-patient; (2) information acquired during this relationship; and (3) the necessity and propriety of the information to enable the doctor to treat the patient skillfully in his professional capacity. [Authority.]" 244 N.W.2d at 602. Under the second element the privilege is limited to "all knowledge and information gained by the physician in the observation and personal examination of the patient in the discharge of his duties." *State v. District Court*, 218 N.W.2d 641, 643 (Iowa 1974).

Dr. Canganelli testified that his testimony and written report, reflecting his professional opinion and judgment, proceeded wholly from the fruits of his court-ordered examination. Because of this and because the examination was outside the physician-patient relationship none of Dr. Canganelli's diagnostic information was gathered in the course of the privileged relationship.

The third element for the privilege requires the "necessity and propriety of the information to enable the doctor to treat the patient skillfully in his professional capacity." *Nowlin*, 244 N.W.2d at 602. The satisfaction of this element proceeds from the second. Again all that Dr. Canganelli considered significant was revealed by the court-ordered examination, which was not conducted for purposes of treatment. Accordingly the third element for the statutory privilege is lacking.

As all three of Rita's challenges to the trial court's ruling on the admissibility of evidence are without merit we reject her first assignment of error.

II. In the trial court proceedings evidence was admitted that Rita is diabetic and suffers from certain infirmities which might result from that condition. Rita believes that the trial court relied, at least in part, upon that evidence. The petition to terminate did not specify diabetes as one of the grounds on which termination was sought. Rita argues that under *Long v. Long*, 255 N.W.2d 140, 144–45 (Iowa 1977), it denied due process to receive and consider evidence about diabetes.

We need not consider the assignment because we have not considered any evidence relating to Rita's diabetic condition and any infirmities, problems, or difficulties which might result from that condition. Our review of the trial court's determination is de novo. *In Interest of Kelley*, 262 N.W.2d 781, 782 (Iowa 1978). Since Rita's diabetic

condition plays no part in our determination we give this assignment no further consideration. The evidence of her unfitness is overwhelming without considering Rita's diabetic condition.

III. In Rita's final assignment she argues that it was error to terminate her parental rights because she had never had any parent-child relationship with Kermit. In this assignment she cites *Alsager v. District Court of Polk County, Iowa,* 406 F.Supp. 10 (S.D.Iowa 1975), and the constitutional provisions cited in support of that holding. She points to the specific language of the statutory ground for the termination: "conditions directly relating to the parent-child relationship . . . ." She argues from the fact that she has never known Kermit and concludes that none of her unfitness is directly related to the parent-child relationship.

Rita's position on this assignment contains its own contradiction. Under her theory she would be protected from termination by her own unfitness—if it became so extreme as to have isolated her from any relationship with the child. Her position would become increasingly strong as her unfitness became increasingly aggravated.

We reject the contention as a play on words. Rita's unfitness is a condition directly relating to the parent-child relationship. It relates to it so directly and to such an extent as to have destroyed it. The trial court's adjudication amounted only to a judicial acknowledgment of a de facto termination which Rita's unfitness had long before brought about.

Rita's condition is touching and tragic. But our responsibility under the statute is clear. Kermit is not to blame for any of Rita's unfitness. In the ten formative years of Kermit's life he has never known her and from this record it must be said that this is fortunate. For whatever is left of his youth he should be freed from any legal relationship with Rita so that he can proceed with what is left of his childhood and spend the remainder of his youth is a more stable and normal familial situation. We have said many times that children cannot wait to grow up.

The judgment of the trial court must be and is affirmed.

AFFIRMED.