**Charles E. LIGONS, Appellant,**

v.

**BECHTEL POWER CORPORATION, Appellee.**

No. 79–1848.

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1980.

Decided June 16, 1980.

Lloyd E. Humphreys, Humphreys & Associates, Cedar Rapids, Iowa, for appellant.

Patrick M. Roby, Shuttleworth & Ingersoll, Cedar Rapids, Iowa, for appellee; Thomas M. Collins, Jr., Cedar Rapids, Iowa, on brief.

Before LAY, Chief Judge, ROSS, Circuit Judge, and LARSON, District Judge.*

ROSS, Circuit Judge.

Charles E. Ligons appeals from a judgment of the district court[1] rejecting his claims brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*[2] In that action Ligons alleged that his employer, Bechtel Power Corporation, had discriminated against him on the basis of race in its employment testing and layoff practices.

Following a hearing, the district court denied Ligons' claim, finding that Bechtel had rebutted Ligons' prima facie case of disparate treatment and that Ligons had failed to establish by competent evidence that Bechtel's proffered justifications were a mere pretext for racial discrimination. We affirm.

Ligons, a black, was first employed by Bechtel in September of 1971 as a welder at the Iowa Electric Light and Power Duane Arnold Energy Center construction site at Palo, Iowa. To meet its contractual obligations with Iowa Electric, Bechtel required that its welders be qualified in accordance with standards of the American Society of Mechanical Engineers Boiler and Pressure Vessel Code (ASME), Section IX (1971 ed.). That Code prescribes objective criteria for testing welders on various types of welding work and for placing them in two general categories: (1) P1–A–LH, under which a welder qualifies to perform general welding jobs, and (2) P1–AT–LH, involving more difficult welding procedures. Prior to his arrival at Palo, Iowa, Ligons passed a test which qualified him under P1–AT–LH to perform heliarc welding. During his first week of employment, however, Ligons was required to report to the test shop for training and testing as a result of observations made by a welding engineer, of a weld which Ligons had improperly prepared. Following a one-week training period, Ligons passed a simple plate welding test, but failed the same heliarc welding test which he had passed before coming to Palo. Ligons spent several weeks on at least three separate occasions training for upgrading

---

* The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable Edward J. McManus, Chief Judge of the United States District Court for the Northern District of Iowa.

2. Claims brought by Ligons pursuant to 42 U.S.C. §§ 1981, 1985 and 1986, previously dismissed by the district court, *Ligons v. Bechtel Power Corp.*, No. C 77–41 (N.D.Iowa, December 20, 1977), are not the subject of this appeal.

and testing to assure his competence to perform various types of welds.

On February 9, 1973, Ligons was laid off along with 58 other pipefitter-welders, all of whom were white. Ligons was informed that he was eligible for rehire when more welders were needed, the layoff being the result of a general reduction in work force on the Palo project.

When rehired by Bechtel as a welder on the Palo project in September of 1973, Ligons required further training and testing for recertification. After approximately one month of training, Ligons qualified only to perform plate welding, the least difficult type of welding. On February 22, 1974, Ligons was one of six welders laid off, again as a result of a reduction in the work force, this reduction being based strictly on seniority.

From these facts, the district court determined that Ligons made a prima facie showing of disparate treatment under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), with respect to his claims of discriminatory application of testing procedures and layoffs, but not as to his claim that he was denied opportunities to upgrade his welding qualifications.

█ Ligons' prima facie showing of disparate treatment shifted the burden to the company to prove that its manner of testing and layoffs of Ligons were based on "a legitimate consideration, and not an illegitimate one such as race  *  *  * . To dispel the adverse inference from a prima facie showing under *McDonnell Douglas*, the employer need only 'articulate some legitimate, nondiscriminatory reason for the employee's [treatment]'." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577–78, 98 S.Ct. 2943, 2950 (1978), *citing McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 802, 93 S.Ct. at 1824.

After considering Bechtel's rebuttal evidence, the district court found legitimate reasons for justifying the testing and layoffs of Ligons. Specifically, the court found that

[d]efendant has rebutted plaintiff's prima facie case of discrimination by a preponderance of the evidence showing that its testing procedures for upgrading of welders' qualifications had a manifest relationship to the welding jobs for which they were used, *see Griggs v. Duke Power Co.*, 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971); that their application to plaintiff individually was not racially motivated or otherwise discriminatory on the basis of race, *Thompson v. McDonnell Douglas Corp., supra*, 416 F.Supp. 972 at 982; and that plaintiff's lay-offs were not actuated by racial considerations but rather were based on valid non-discriminatory evaluations of plaintiff's qualifications and borne of business necessity in furtherance of a legitimate reduction in force, *see Thompson v. McDonnell Douglas Corp., supra*, 416 F.Supp. at 982; *compare Lumas v. Commercial Cartage Corp., supra* [444 U.S. 1022, 100 S.Ct. 682, 62 L.Ed.2d 655], Slip Op. at pp. 4–5; *Mopkins v. St. Louis Die Casting Corp.*, 423 F.Supp. 132, 135 (E.D. Mo.1976), *aff'd*, 569 F.2d 454 (8th Cir. 1978).

█ In his suit and on this appeal Ligons alleges that Bechtel failed to establish that race was not a motivating factor in the decision to lay him off. Appellant misconceives the nature of the burden imposed on a Title VII litigant alleging disparate treatment. The employer as a Title VII defendant need not "prove absence of discriminatory motive to escape liability; a prima facie showing of disparate treatment shifts only the burden of producing evidence to the employer, not the burden of persuasion." *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 702 (8th Cir. 1980); *Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). *See also Vaughn v. Westinghouse Electric Corp.*, 620 F.2d 655, at 659 (8th Cir. 1980).

█ Bechtel clearly met this burden of production. It established that the layoffs were due to business necessity and in furtherance of a legitimate reduction in the work force.

The evidence established that personnel requirements fluctuated as the project progressed. In light of the variance in work force, Ligons admitted that layoffs were anticipated. He also stated that he knew there would be a general reduction in the work force because the project was "winding down." Indeed, the fact that 58 other pipefitter-welders, all white, were also laid off at the time of Ligons' initial layoff clearly rebuts any inference of discriminatory animus against Ligons.

Criteria for Ligons' initial layoff included qualifications, skill, and productivity. Richard Alberts, a pipefitter and foreman, testified that only *fitters* less qualified, skilled and productive than Ligons were retained at the time Ligons was first laid off.

There is no evidence that *welders*[3] less qualified, skilled or productive than Ligons with respect to the particular aspect of work then required at Palo were retained. Indeed, one welding engineer testified that to his knowledge, no other employee with Ligons' qualifications spent as much time upgrading or taking tests from September of 1971 to February of 1973 as Ligons.

Nor is there evidence to suggest that the welding tests given Ligons were discriminatorily applied so as to prevent Ligons' certification for the more difficult welding procedures. In evidence is an exhibit which demonstrates only that other welders sometimes failed the tests. In addition, Joseph Antriking testified that he took a job as a fitter because *everyone* was having difficulty passing the tests.

The tests were based on objective welding standards set by the American Society of Mechanical Engineers. Bechtel was contractually bound to insure that its welders were qualified under, and that all welding performed on the job complied with, these standards.

Ligons' assertion that, contrary to typical procedure in the welding industry, his foreman did not assess his qualifications and never recommended that he be laid off, is without merit. Joseph Antriking, a pipefitter and foreman at the time of Ligons' first layoff, testified that at this particular job, the foremen were *never* consulted about layoffs. Instead, Billy Seals, a craft superintendent who frequented the job site observing the welders' work, made the recommendations as to which welders to lay off.

Ligons does not challenge the company's use of seniority in determining that he be laid off in February of 1974. At the time of his second layoff, he was performing the less sophisticated, plate welding techniques.

In view of our finding that the first layoff was legitimate, we must conclude that the second layoff was also nondiscriminatory, since Ligons' lack of seniority at the time of that layoff was a direct result of his being laid off initially. We agree with the district court's determination that the company effectively rebutted Ligons' prima fa-

---

**3.** Since Ligons was not hired as a pipefitter, and made no attempt to reclassify as such, the district court was correct in rejecting his contentions as to discrimination based on the retention of pipefitters when welders were laid off.

As the district court noted:
In the pipefitter trade generally and as it operated at defendant's Palo project, there exists two classifications: welder and fitter. It is generally recognized that a welder is qualified to do a fitter's job, but that a fitter is not qualified to do a welder's job. Pipefitter hiring and lay-offs at the Palo project were pursuant to this welder-fitter categorization, as required by defendant's agreement with the pipefitter union. Under that agreement a person seeking employment as a welder at the Palo project had to proceed through the Union hiring hall in Des Moines, Iowa. For employment as a fitter, a person had to proceed through the Cedar Rapids, Iowa Union hall. No transfers between the welder and fitter categories were made at the job site. A person desiring such transfer had to proceed through the respective union hiring halls. Plaintiff does not challenge this procedure. Therefore, the court does not decide whether such procedures are inherently discriminatory.

Thus, although the evidence does indicate that at the time of plaintiff's February, 1973 lay-off fitters were retained on the Palo job site, this fact is not material to plaintiff's claim that he was discriminatorily laid-off in spite of his asserted qualifications *as a welder.*

*Ligons v. Bechtel Power Corp.,* No. C 77–41, slip op. at 4 (N.D.Iowa Sept. 7, 1979).

cie showing of disparate treatment in both its testing and layoffs of Ligons, as well as its determination that the testing procedures for upgrading welder's qualifications had a manifest relationship to the welding jobs for which they were used.

Those determinations did not end the district court's inquiry. As mandated by *McDonnell Douglas, supra,* 411 U.S. at 804, 93 S.Ct. at 1825, Ligons was given an opportunity to introduce evidence that Bechtel's proffered justifications for the layoffs and his failures at welding tests were a mere pretext for racial discrimination.[4] Despite his efforts to establish that the welding tests were discriminatorily applied and that the layoffs were unwarranted, the district court concluded that Ligons failed to show by competent evidence that Bechtel's proffered justifications for Ligons' treatment were pretextual.

Our careful review of the record convinces us that the district court's findings are not clearly erroneous. Fed.R.Civ.P. 52(a). Contrary to Ligons' assertions, the record does not support a finding that Bechtel continued to hire welders at the time of Ligons' layoffs or shortly before or thereafter, or that Bechtel employed an "overload" technique or other procedure whereby it hired beyond its needs for the purpose of reducing its work force in a discriminatory manner. Rather, it appears from the record that Ligons received much assistance and instruction from the company in maintaining and upgrading his qualifications and that he was laid off in accordance with Bechtel's typical policies at this job site based on a legitimate need to reduce the work force.

The judgment of the district court is affirmed. Each party shall pay its own costs.

---

4. In his brief, Ligons claimed that Richard Alberts "stated that Ligons had the skill and qualifications necessary for welding jobs and that there were employees who were retained by the Defendant who had less qualified skills and productivity than Mr. Ligons did at the time of his first layoff." The record discloses that Mr. Alberts, a fitter, served as Charles Ligons' foreman from approximately September 14, 1973 (when Ligons was rehired by Bechtel) to January 15, 1974 (one month prior to his second layoff). Mr. Alberts testified that in his opinion Ligons had the skill and qualifications to properly perform his welding tasks. His testimony, however, was that *fitters* were the only employees retained after the second layoff—a layoff based strictly on seniority—who had less qualified skills and productivity than Ligons. As noted previously, fitters and welders were separately classified at Palo. *See* note 3, *supra.*

Ligons also claimed that Joseph Antriking, a pipefitter and foreman, "testified that there were people who maintained their employment after Ligons' layoff who were less qualified, with fewer skills and less productivity than Mr. Ligons." Mr. Antriking did testify to that effect. But he also testified that he and Ligons were working in different areas of this rather extensive project at the time of Ligons' first layoff, and that he was unfamiliar with and therefore, unable to directly compare, the skills of the other employees in Ligons' crew. Antriking had worked with Ligons more than one year prior to Ligons' initial layoff for a period of only two months. When asked why he opposed Ligons' layoff, Antriking responded that he felt that no one should be laid off unless the job was finished. The district court considered the testimony of these witnesses insufficient to establish that Bechtel's proffered justifications for the layoffs were pretextual.