LINN CO–OPERATIVE OIL
COMPANY, Appellee,

v.

Mary QUIGLEY and the Iowa Civil
Rights Commission, Appellants.

No. 65158.

Supreme Court of Iowa.

May 13, 1981.
Rehearing Denied June 10, 1981.

Thomas J. Miller, Atty. Gen. and Susan L. Jacobs, Asst. Atty. Gen., for appellants.

Janice A. Aasgaard and Robert J. Stone of White & Stone, Marion, for appellee.

REYNOLDSON, Chief Justice.

The district court reversed an order of respondent Iowa Civil Rights Commission (Commission), which found petitioner Linn Co-Operative Oil Company guilty of sex discrimination. The employer fired respondent Mary Quigley from her position as a part-time gas station attendant. The basic issue in this appeal is whether the Iowa Administrative Procedure Act (IAPA) was applicable to the district court proceeding. We find it was not, and affirm.

Quigley's sex discrimination complaint was filed with the Commission on February 27, 1975. It was made under section 601A.7(1)(a), The Code 1973, which provided:

It shall be an unfair or discriminatory practice for any:

(a) Person ... to discharge any employee ... because of the ... sex ... of such ... employee, unless based upon the nature of the occupation.

When this complaint was filed, appeals from agency adjudications were triable de novo in district court pursuant to section 601A.10(6), The Code 1973.

The IAPA, Code chapter 17A, became effective July 1, 1975. A hearing on Quigley's complaint was not held until 1977, and the Commission did not adopt the hearing officer's findings, conclusions, and recommended order until April 1978.

Within thirty days of the Commission's decision, the employer filed a petition in equity in district court, requesting issues raised in the Quigley complaint be reviewed de novo as provided in section 601A.10(6), The Code 1973. Notice of the petition was served personally on the Commission and Quigley.

January 30, 1979, Judge Vietor filed an order of remand for further proceedings, in which he noted the remand request was submitted "upon oral arguments of counsel." This order characterized the proceeding as "a judicial review proceeding under the authority of Iowa Code Section 17A.19," despite the fact review expressly was sought under the 1973 Code, not under the IAPA. Section 601A.10(5), The Code 1973, authorized a party to "move the court to remit the case to the commission ... for the purpose of adducing additional ... evidence." But Judge Vietor apparently relied instead on section 17A.19(8) of the IAPA, which also authorizes such remand.

Upon remand to the Commission, a hearing was held at which evidence concerning employee time records was introduced. The hearing officer's recommended decision on remand was adopted by the Commission August 9, 1979. The employer then amended its petition in equity to seek judicial review of this order.

The Commission contended in district court that judicial review was governed by the IAPA, not by section 601A.10. Under the IAPA, the employer would not be entitled to de novo review and would be entitled to relief only by alleging and establishing one of the grounds specified in section 17A.19(8). None of the section 17A.19(8) grounds was alleged in the employer's petition.

The district court held the IAPA inapplicable and, reviewing the evidence de novo, found there was no chapter 601A sex discrimination.

I. Applicability of the IAPA in this controversy turns on section 17A.23. In relevant part it provides:

The Iowa administrative procedure Act shall be construed broadly to effectuate its purposes. This chapter shall also be construed to apply to all agencies not expressly exempted by this chapter or by another statute specifically referring to this chapter by name; *and except as to proceedings in process on July 1, 1975,* this chapter shall be construed to apply to all covered agency proceedings and all agency action not expressly exempted by this chapter or by another statute specifically referring to this chapter by name.

(Emphasis supplied.) Under the above statute, the IAPA does not apply to "proceedings in process on July 1, 1975." Thus all of the Act, including its review provision, is inapplicable where a "proceeding" was commenced before the effective date of the IAPA, July 1, 1975.

To determine whether certain events initiate a proceeding, it seems logical to apply the case law existing at the time of those events. If a proceeding was "in process" prior to July 1, 1975, it obviously was a proceeding when viewed in light of pre-IAPA principles. Yet the Commission argues this determination should be made by applying the IAPA and cases interpreting it, even though that legislation did not exist at the time the complaint in this case was filed.

February 27, 1975, when Quigley filed this complaint, there were no statutes defining "contested case," "party," or "person." In *Estabrook v. Iowa Civil Rights Commission,* 283 N.W.2d 306 (Iowa 1979), we merely determined a contested case evidentiary hearing was not required under circumstances the record disclosed. We did not interpret section 17A.2(2) to mean that *only* a "contested case" is a proceeding. Similarly, the language of section 17A.1(2) ("contested case proceedings") is not helpful in classifying an action taken before its enactment.

In ascribing a meaning to "proceedings in process," undefined in chapter 17A, we reject the principle that implies the phrase must be interpreted within the confines of the IAPA. Cases like *Goergen v. State Tax Commission,* 165 N.W.2d 782, 785 (Iowa 1969), are of little benefit because they merely restate the settled principle that all parts of the statute should be read together to determine its meaning, not that the meaning of otherwise unidentified terms must be gleaned *exclusively* from within the statute under scrutiny.

Other rules of interpretation are more applicable. Several of our decisions hold that when a statute contains no definition of words used, they are to be construed according to their "approved usage." *See, e. g., In Interest of Hoppe,* 289 N.W.2d 613, 616 (Iowa 1980); *State ex rel. Turner v. Drake,* 242 N.W.2d 707, 709 (Iowa 1976); *State v. Kool,* 212 N.W.2d 518, 520 (Iowa 1973). An "approved usage" surely would include prior judicial interpretations. "In construing a statute we must be mindful of the state of the law when it was enacted ...." *Egan v. Naylor,* 208 N.W.2d 915, 918 (Iowa 1973). "We assume the legislature knew the existing state of the law and prior judicial interpretations of similar statutory provisions. We assume, too, its use of terms was in the accepted judicially established context unless there is clear evidence to the contrary." *Jahnke v. Incorporated City of Des Moines,* 191 N.W.2d 780, 787 (Iowa 1971). There is no "clear evidence" in this case that the legislature intended a section 17A.23 "proceeding" to mean anything different from its meaning under the then-existing state of the law and prior judicial interpretations.

It follows that our case law antedating the effective date of the IAPA is determinative. In *Iowa Civil Rights Commission v. Massey-Ferguson, Inc.,* 207 N.W.2d 5 (Iowa 1973), a civil rights case, we had before us a statute of limitation question arising under section 105A.9(15), The Code 1966, which later became section 601A.9(15), The Code 1973. We referred to the filing of the complaint as an administrative *proceeding:*

The time in which an administrative proceeding may be brought is often regulat-

ed by the statute providing for such proceeding, and a failure to comply with such statute may bar the administrative proceeding and any judicial proceeding which depends thereon.

*Id.* at 9–10. Our observation in *Massey-Ferguson* that the complaint launches a "proceeding" is supported by *Parker v. Califano,* 561 F.2d 320, 324, 327–28 (D.C.Cir. 1977) (under Civil Rights Act statute permitting attorney fee award "in any action or proceeding," held, attorney fees were allowable for services leading to filing complaint under a proper broad construction of "proceeding"); *United States v. Vixie,* 532 F.2d 1277, 1278 (9th Cir. 1976) (an administrative investigation is a "proceeding" within the meaning of statute relating to obstructing agency *proceedings* ); *Cardinali v. Planning Board,* 373 A.2d 251, 253 (Me.1977) (application for subdivision submitted prior to moratorium ordinance was encompassed within the general savings clause definition of proceeding "pending"); *Banach v. State Commission on Human Relations,* 277 Md. 502, 509–10, 356 A.2d 242, 247 (1976) ("The word 'proceedings' is a term of broad scope, encompassing both the investigative and adjudicative functions of an administrative agency."). The provisions of the federal Civil Rights Act make it clear that filing a complaint before a state or local agency with authority to grant relief from discriminating practices is the commencement of a "proceeding." *See, e. g., Parker,* 561 F.2d at 327; 42 U.S.C. § 2000e–5(c) (1976).

■ When the legislature enacted the IAPA it identified, for the first time in this jurisdiction, a "contested case proceeding," and certainly recognized its limited nature. Had the legislature wanted to confine "proceedings in process" to *contested case* proceedings in process it easily could have used that then-familiar language in section 17A.23. We hold the filing of Quigley's complaint triggered a proceeding that was "in process" when the IAPA became the law; consequently, under section 17A.23, the provisions of that legislation do not apply in this controversy.

■ II. Because the review provisions of IAPA section 17A.19 do not apply in this case, the district court properly reviewed the evidence de novo. There was ample evidence to support its finding that Quigley was not discriminated against because of her sex. A female former employee who held the same job testified females found no discriminatory practices by this employer. Quigley was hired in preference to two male applicants. It is unreasonable to speculate that this employer suddenly reversed its nondiscriminatory philosophy, expressed in its company manual, in terminating Quigley's employment.

The evidence fully substantiated district court's finding that Quigley was terminated because the work slacked off and because she was creating disciplinary problems. While none of the employees was blameless, she provided additional grounds. Her immediate supervisor testified:

Q. What were her failings? A. ... I remember several cold, rainy days where if we were busy, we'd have all three of us out there ... and sure, you all got wet

. . . .

Q. What would Mary [Quigley] do at these times? A. Well, she would come in, sit down. I remember several times she just came in and sat down with her back to the heater and to the drive, and it was too cold to do anything, she said.

Q. She would let the rest of you do all the work? A. Yes.

Q. Because she was too cold? A. Yes, that's what she said.

. . . .

Q. Did they [other employees] complain to you about her not doing her share of the work? A. Yes, they would.

The evidence is unrefuted that after Quigley was fired most of the disciplinary problems ceased.

■ It is equally apparent the hearing officer (whose findings and order the Iowa Civil Rights Commission adopted) improperly imposed the burden of proof on the employer. The officer found Quigley had established a prima facie case by proving (1) she was a female and (2) when there was a cutback in work force she was terminated,

and "similarly situated" males, and males with less seniority, were not terminated. Of course, district court did not find the males were "similarly situated," in view of Quigley's conduct. Moreover, the hearing officer found that

> [t]o overcome the prima facie case Respondent [employer] *had to show* either that sex was a bona fide occupational qualification, that the termination was a business necessity or that Complainant [Quigley] was terminated pursuant to a rational and neutral business policy applied to all employees.

(Emphasis supplied.)

■ We have found no rule that thus shifts the burden of proof to the employer. Everyone is presumed to have discharged his or her duty, whether legal or moral, until the contrary is made to appear. *Dorf v. Relles*, 355 F.2d 488, 492 (7th Cir. 1966); *Baker v. Beal*, 225 N.W.2d 106, 110 (Iowa 1975). In these cases, "[c]omplainant has [the] burden of proof, not the respondent." *Iron Workers Local 67 v. Hart*, 191 N.W.2d 758, 772 (Iowa 1971). The burden of persuasion never shifts. *McDowell v. Town of Clarksville*, 241 N.W.2d 904, 908 (Iowa 1976).

In *Texas Department of Community Affairs v. Burdine*, 450 U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court reversed the United States Court of Appeals for the Fifth Circuit for utilizing the same burden-shifting technique employed by the hearing officer in the case before us. The circuit court had imposed on the employer the burden to prove by a preponderance of the evidence the existence of legitimate nondiscriminatory reasons for the challenged action. The Supreme Court, holding the court of appeals had misinterpreted its decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), reiterated that a prima facie case is rebutted when the employer merely produces "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not been* motivated by discriminatory animus." *Burdine*, 450 U.S. at —, 101 S.Ct. at 1096, 67 L.Ed.2d at 218 (emphasis supplied).

"The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at ——, 101 S.Ct. at 1094, 67 L.Ed.2d at 216. The *Burdine* Court held:

> The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Id.* at ——, 101 S.Ct. at 1095, 67 L.Ed.2d at 217.

Had the hearing officer applied the case law of this jurisdiction and the rationale the Supreme Court later applied in *Burdine*, the officer and the district court well may have arrived at the same result.

We affirm the district court ruling that the complaint be dismissed.

AFFIRMED.

All Justices concur except McCORMICK, J., who dissents, and UHLENHOPP, J., who joins division I of the dissent and SCHULTZ, J., who takes no part.

McCORMICK, Justice (dissenting).

I believe judicial review is governed by the Iowa Administrative Procedure Act. Because the employer did not allege a basis for reversal of the Commission's decision under the IAPA, I would reverse the district court and remand for an order enforcing the agency's decision. Even if the IAPA did not apply, I would reach the same conclusion as the Commission through de novo review.

I. *Applicability of the IAPA.* This case was submitted twice in district court. The first submission, to Vietor, J., resulted in an

order of remand to the Commission for addition of employee time records to the evidence, clarification of a hearing officer finding, and review of the amended record. In its order of remand the court characterized the case as "a judicial review proceeding under the authority of Iowa Code section 17A.19." Authority for the remand was found in section 17A.19(8) of the IAPA. After amendment of the record, the Commission affirmed its prior order, and the case was submitted again in district court.

It was only in the second submission, to Schultz, J., that the court held the IAPA was inapplicable and reviewed the evidence de novo. On the merits, the court found the Commission failed to sustain its burden of proof on the discrimination charge. As a result, the court reversed the Commission and dismissed Quigley's complaint. In this appeal, the Commission contends the court erred in the second submission in holding that judicial review was not governed by the IAPA.

The question of the applicability of the IAPA is addressed in the statute itself. In relevant part, section 17A.23 provides:

> The Iowa Administrative Procedure Act shall be construed broadly to effectuate its purposes. This chapter shall also be construed to apply to all agencies not expressly exempted by this chapter or by another statute specifically referring to this chapter by name; *and except as to proceedings in process on July 1, 1975*, this chapter shall be construed to apply to all covered agency proceedings and all agency action not expressly exempted by this chapter or by another statute specifically referring to this chapter by name.

(emphasis added). Under this provision, the present action was subject to the IAPA unless it was a "proceeding in process on July 1, 1975."

Because the polestar in statutory interpretation is legislative intent, the issue is what the legislature intended these words in the IAPA to mean. No definition of proceeding in process is given. Thus section 4.1 is applicable:

In the construction of statutes, the following rules shall be observed, unless such construction would be inconsistent with the manifest intent of the general assembly, or repugnant to the context of the statute: . . .

2. *Words and phrases.* Words and phrases shall be construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, shall be construed according to such meaning.

The word "proceeding" is not technical, nor has it acquired a peculiar meaning in law. *See Eldridge City Utilities v. Iowa State Commerce Commission*, 303 N.W.2d 167 (Iowa 1981). Our task, therefore, is to construe proceedings in process "according to the context and approved usage of the language." The inquiry is not what "proceedings in process" might mean in some other context but what the term means as used in section 17A.23 of the IAPA. *See Hanover Insurance Co. v. Alamo Motel*, 264 N.W.2d 774, 778 (Iowa 1978) ("Issues of statutory construction cannot be resolved from isolated words taken out of context.").

In section 17A.23 the legislature directed a broad construction of the statute to effectuate its purposes. The remedial and beneficial purposes of the IAPA are stated in section 17A.1(2). Independent of the mandated broad construction of the statute, we have recognized that "[a]n ameliorative change should be extended to every case in which it properly can apply." *State v. Wiese*, 201 N.W.2d 734, 737 (Iowa 1972). Section 17A.23 makes the IAPA applicable in all cases, with tightly-drawn exceptions. Proceedings in process are among the exceptions. Because the exceptions must be construed narrowly, proceedings in process must be construed narrowly.

This issue was analyzed in Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, The Rulemaking Process*, 60 Iowa Law Rev. 731, 758 (1975):

[W]here such an exemption from the IAPA is found to exist, it should be construed narrowly by the agencies and the courts. Exemptions from a comprehensive code like the IAPA implementing very important public policies should always be read narrowly in order to maximize the underlying general legislative purposes. This is particularly so where those basic purposes are to secure as much uniformity of minimum administrative procedure as is feasible, and as much fairness in all administrative proceedings as is feasible, consistent with other important conflicting values. In light of prior discussion, the section 23 exemption for "proceedings in process on [the IAPA's] effective date," which is July 1, 1975, should also be read narrowly. It should, therefore, exclude from the IAPA only those particular rulemaking proceedings actually commenced prior to that date by submission of the rule under current Chapter 17A to the Legislative Rules Review Committee and Attorney General, or actually commenced by taking the first prescribed formal step under another statute specifying additional or substitute rulemaking procedures for an agency. *Similarly, that section 23 phrase should be read narrowly to cover only those particular contested case proceedings actually commenced prior to July 1, 1975, by filing the equivalent of the section 12(1) notice*; and only those judicial review proceedings actually commenced prior to July 1, 1975, by the filing of notice adequate for that purpose under prior law. (emphasis added). A "section 12(1) notice" is the written notice of hearing, whose delivery constitutes "commencement of the contested case *proceeding*." § 17A.12(1) (emphasis added). I agree with Professor Bonfield's analysis of legislative intent in section 17A.23.

We have recognized that the investigative stage which follows the filing of a complaint under chapter 601A is not a contested case. *Estabrook v. Iowa Civil Rights Commission*, 283 N.W.2d 306, 311 (Iowa 1979) ("The commission's probable cause function is not a section 17A.12 contested case because the Constitution does not require an evidentiary hearing."). In the present situation, the section 17A.12(1) notice was not served upon the employer until November 1977. Because the contested case proceeding did not commence until then, it was not "in process" on July 1, 1975. Thus the IAPA governed the proceeding.

This conclusion is supported by the legislature's indication in other provisions of chapter 17A as to what constitutes a "proceeding." These provisions constitute part of the context in which section 17A.23 must be construed. *See Osborne v. Edison*, 211 N.W.2d 696, 697 (Iowa 1973). The term "proceeding" in the IAPA is used to embrace the formally-initiated rulemaking process and cases which have reached the adversary stage. In section 17A.1(2), the statute provides: "This chapter is meant to apply to all *rulemaking and contested case proceedings* and all suits for the judicial review of agency action that are not specifically excluded from this chapter or some portion thereof by its express terms or by the express terms of another chapter." (emphasis added). In addition, one of the purposes of the act is "to increase the fairness of agencies in their conduct of *contested case proceedings. . . ." Id.* (emphasis added). Furthermore the statute provides: "*'Contested case' means a proceeding* including but not restricted to ratemaking, price fixing, and licensing in which the legal rights, duties or privileges of a party are required by Constitution or statute to be determined by an agency after an opportunity for an evidentiary hearing." § 17A.2(2) (emphasis added).

Because the IAPA was applicable to the contested case proceeding, the judicial review provisions of section 17A.19 were the exclusive means for obtaining review of the Commission's order. *See Jackson County Public Hospital v. Public Employment Relations Board*, 280 N.W.2d 426, 428–29 (Iowa 1979); *Salsbury Laboratories v. Iowa Department of Environmental Quality*, 276 N.W.2d 830, 833–35 (Iowa 1979); *Kerr v. Iowa Public Service Co.*, 274 N.W.2d 283, 287–88 (Iowa 1979).

This, of course, does not end the inquiry. We have recognized that the label attached to the district court petition is not determinative "if the instrument, its filing and other procedural steps met section 17A.19 requirements." *Neumeister v. City Development Board,* 291 N.W.2d 11, 13 (Iowa 1980). Under *Neumeister,* the district court does not acquire jurisdiction of a petition for judicial review unless file-stamped copies of the petition are mailed by the petitioner to all parties named in the petition within ten days of the petition's filing as required by section 17A.19. The record in this case shows copies of the petition were personally served rather than mailed. This in itself would require reversal of the district court. For present purposes, however, I will assume the district court had jurisdiction of the employer's petition.

The fact remains that the petition did not attack the Commission's order on a ground specified in section 17A.19(8). *See* § 17A.19(4)(d). The employer merely sought a different result based on de novo review. The sufficiency of the evidence ground in section 17A.19(8)(f) was not urged. Therefore no basis was alleged upon which relief could be obtained under the IAPA. Furthermore, no claim can be made that any ground provided in section 17A.19(8) was tried by consent of the parties. Instead, the employer rested entirely on its contention it was entitled to a de novo trial pursuant to section 601A.10(6). I would conclude that the employer's petition did not meet section 17A.19 requirements. Therefore I would not decide whether the substantial evidence test was satisfied in this case. Instead I would reverse the district court and remand for an order enforcing the Commission's decision pursuant to its petition for such an order under section 601A.15, The Code 1975.

II. *The result upon de novo review.* Even if our review were de novo, I could not concur in the findings of the court. I would hold that the employer discriminated against Quigley on the basis of her sex in violation of section 601A.7(1)(a), The Code 1973.

It is difficult to discern what legal standard the district court or this court used in determining Quigley did not prove her case. This court has not delineated principles governing proof of an employment discrimination complaint under the Iowa Civil Rights Act. Because the court has given persuasive effect to federal cases interpreting comparable provisions of Title VII of the 1964 Civil Rights Act, I assume the court will adopt the federal principles governing proof of employment discrimination. *See Cedar Rapids Community School District v. Parr,* 227 N.W.2d 486, 492–93 (Iowa 1975); *Wilson-Sinclair Co. v. Griggs,* 211 N.W.2d 133, 139 (Iowa 1973).

Two types of employment discrimination cases have been recognized under the federal statute. One type is based on a theory of disparate treatment, and the other is based on a theory of disparate impact. Disparate treatment cases involve claims that the employer treats an employee or employees less favorably than others based on race, color, religion, sex or national origin. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1954, 52 L.Ed.2d 396, 415 (1977). In contrast, disparate impact cases involve claims that facially neutral policies of the employer have a proscribed discriminatory effect. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 164 (1971). Different principles govern these two types of cases. Because the present case is based on allegations of disparate treatment, only the principles which govern that kind of case are relevant here.

The elements of a prima facie case of disparate treatment are listed in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of racial discrimination in hiring, the Court said a complainant is required to offer evidence:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, af-

ter his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

Thus, in order to make a prima facie case of disparate treatment in discharge, a complainant is required to present evidence (1) that he belongs to a group protected by the statute; (2) that he was qualified for the job from which he was discharged; (3) that he was terminated; and (4) that, after his termination, the employer hired a person not in complainant's protected class or retained persons with comparable or lesser qualifications who are not in the protected group. *See Lujan v. State of New Mexico Health and Social Services Department,* 624 F.2d 968, 970 (10th Cir. 1980). Evidence supporting these elements creates an inference that the employer's acts, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957, 967 (1978).

The burden of persuasion does not leave the complainant. However, a prima facie case creates a "presumption" of discrimination which, if believed, will require a finding of discrimination. *Texas Department of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1094, 67 L.Ed.2d 207 (1981). If the employer desires to dispel this presumption, he must produce evidence showing "some legitimate, nondiscriminatory reason" for the challenged action. *McDonnell-Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 668. Thus the distinction between burden of persuasion and burden of production becomes relevant. *See McDonnell v. Town of Clarksville,* 241 N.W.2d 904, 908 (Iowa 1976). We have no reason for finding that the hearing officer or Commission misunderstood this distinction in the present case. If Quigley established a credible prima facie case, it was incumbent on the employer to make a "showing," that is, to produce evidence, to refute it:

This evidentiary relationship between the presumption created by a prima facie case and the consequential burden of production placed on the defendant is a traditional feature of the common law. "The word 'presumption' properly used refers only to a device for allocating the production burden" .... Usually, assessing the burden of production helps the judge determine whether the litigants have created an issue of fact to be decided by the jury. In a title VII case, the allocations of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.

*Burdine,* —— U.S. at ——, n.8, 101 S.Ct. at 1094, 67 L.Ed.2d at 207. *See also Ligons v. Bechtel Power Corp.,* 625 F.2d 771, 773 (8th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 400, 66 L.Ed.2d 246 (1980).

Once the employer has articulated a legitimate, nondiscriminatory reason for its action, the complainant has the burden of persuading the trier of fact that the reason was merely a pretext for discrimination. *See McDonnell-Douglas Corp.,* 411 U.S. at 805, 93 S.Ct. at 1826, 36 L.Ed.2d at 679. Pretext can be shown through cross-examination or additional evidence. *Burdine,* —— U.S. at ——, 101 S.Ct. at 1095, 67 L.Ed.2d at 207. This determination bears on the employer's motive. The complainant has the burden of ultimately establishing that the prohibited conduct was a factor in the challenged action. *Satz v. ITT Financial Corp.,* 619 F.2d 738, 746 (8th Cir. 1980).

Against this background, I believe a de novo review of the record in this case requires findings that Quigley met her burden to make a prima facie case, the employer articulated a legitimate, nondiscriminatory reason for discharging her, and Quigley demonstrated that this reason was pretextual. As a result, I would hold that the Commission was correct in its sex discrimination finding and order.

Because sex discrimination is prohibited by the statute, Quigley was in a protected

group. She adduced substantial evidence that she was qualified for and performing her job. She was discharged, and after her discharge her job was filled by a male. Moreover, she offered testimony that another part-time employee with similar qualifications was retained. Thus, she established a prima facie case of discrimination.

The employer articulated two reasons for the discharge. The first was an annual slackening of sales. The other was poor job performance and misconduct. Although the first reason is a questionable basis for discharge as opposed to layoff, the second reason is a legitimate, nondiscriminatory reason for discharge.

The fighting issue is whether, under the whole record, the reasons for Quigley's discharge were pretextual. More particularly, the issue is whether she met her burden to prove her sex was a factor in her firing.

Quigley was selected and hired by Kenver Scott, the station manager, as a part-time station attendant. During her tenure, the station was staffed in the evening by Scott, Mark Fishel, the assistant manager, and two other part-time employees, Mike Lange and Mike Hay. Scott drew up the work schedule. Two part-time employees worked each evening, usually under Fishel. After 7 p. m. rush hour, one part-time employee would help clean up the station, including the restrooms, and then leave. The other part-time employee remained until closing.

The first articulated reason for Quigley's discharge, a seasonal slackening of business, was admittedly advanced by Scott to avoid a confrontation with her in the presence of a customer. Moreover, it was a basis for layoff rather than discharge, and her position was filled approximately one and one-half months later.

As to the second reason, the record shows she was guilty of poor job performance and misconduct. The employer's problem is that no basis exists for differentiating Quigley's poor performance from that of the other station personnel. No formal workrules or disciplinary policies existed. All employees, including Scott and Fishel, engaged in misconduct which affected their performance. It included bickering and arguing, throwing each other over a railing behind the station, putting each other's cigarettes out, and playing waiting games to stall going out on the drive to assist customers. The part-time employees all had to be reminded to perform their assigned duties. Moreover, neither Scott nor Fishel remembered complaining to Quigley concerning her job performance. Scott admitted he had no first-hand knowledge of her performance.

The events which actually led to Quigley's discharge do not seem to be in dispute. Scott was concerned about the constant bickering and arguing. Fishel, an active participant in those events, recommended Quigley be fired. Without further inquiry, Scott prepared a work schedule omitting her. She happened to see the schedule. When she asked Scott about it in the presence of a customer, he told her she was being laid off because of slow sales. Later he admitted he was firing her, alleging poor job performance. Both Scott and Fishel acknowledged that the arguing and bickering may have resulted from friction based on the male employees' reluctance to work with a female. Neither had any reason to believe Quigley initiated the arguments.

Despite a record which shows Quigley's job performance and conduct could not be differentiated from that of other employees, she was singled out for discharge. Even though misconduct is a proper basis for discharge, a discharge for misconduct cannot be discriminatory. *McDonald v. Santa Fe Transportation Co.*, 427 U.S. 273, 283, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493, 502 (1976) ("The Act prohibits all ... discrimination in employment, without exception for any group of particular employees, and while crime or other misconduct may be a legitimate basis for discharge, it is hardly one for ... discrimination."). Discipline must be meted out equally to employees who engage in misconduct. *Worthy v. United States Steel Corp.*, 616 F.2d 698, 702–03 (3d Cir. 1980).

Principles governing proof of discrimination are based on recognition that discrimi-

natory motive will rarely be boldly announced or readily apparent. *See Wilson-Sinclair Co.*, 211 N.W.2d at 140. Based upon the circumstances surrounding Quigley's discharge, Scott's failure to investigate her performance, and the absence of any disciplinary action against the other employees engaging in similar conduct, I would find Quigley proved that her sex was a factor in the employer's singling her out for discharge.

UHLENHOPP, J., joins division I of this dissent.